**2000 WATERMARK ASSOCIATION, INC., Appellee,**

v.

**The CELOTEX CORPORATION, Appellant.**

**No. 85–1387.**

United States Court of Appeals, Fourth Circuit.

Argued Nov. 7, 1985.

Decided Feb. 28, 1986.

Rehearing Denied March 25, 1986.

---

John Gregg McMaster (Tompkins, McMaster & Thomas, Columbia, S.C., on brief), for appellant.

D. Cravens Ravenel (Belser, Baker, Barwick, Ravenel, Toal & Bender, Columbia, S.C., on brief), for appellee.

Before CHAPMAN and SNEEDEN, Circuit Judges and HILTON, United States District Judge for the Eastern District of Virginia, sitting by designation.

CHAPMAN, Circuit Judge:

The central question in this products liability case is whether, under South Carolina law, a plaintiff can recover in negligence for an intangible economic loss. The district court held that such recovery was permissible. We disagree, and we reverse and remand.

## I

Asphalt shingles manufactured by the defendant, Celotex Corporation (Celotex), were installed on a condominium project, 2000 Watermark Place, in 1974, 1975, and 1978. In 1982 the Homeowner's Association, 2000 Watermark Association, Inc. (Watermark), learned that blisters had appeared on many of these shingles. Believing that these blisters were the result of a manufacturing defect, Watermark brought this action in the United States District Court for the District of South Carolina, advancing three theories of recovery: negligence, breach of express warranty, and breach of the implied warranty of merchantability.

Watermark has never alleged that these shingles actually leaked. The damage alleged is economic and aesthetic. Watermark charges that the blisters have shortened the life expectancy of the roof and destroyed its aesthetic appeal. Celotex acknowledges that a roof has two functions—to shed rain and to look good. Moreover, Celotex admits that these blisters shortened the life expectancy of the roof.

This case was tried before a jury. On special interrogatories, the jury found for Celotex on breach of express warranty and for Watermark on the implied warranty and negligence theories. The jury returned a verdict of $40,679 in actual damages and $250,000 in punitive damages.

The question is whether, under South Carolina law, a plaintiff can recover in negligence for injuries which are purely economic. If such a recovery is not permissible, then this court must decide if the case should be remanded for a new trial solely on the warranty theories.

## II

The courts of South Carolina have never decided, in the context of a products liability suit, whether an action for negligence can be maintained for purely economic injuries. In the case of *Purvis v. Consolidated Energy Products Co.*, 674 F.2d 217 (4th Cir.1982), this court decided that South Carolina would not permit recovery for purely economic loss in a Restatement (Second) of Torts § 402A strict products liability action. Watermark argues that *Purvis* is not relevant to the case at bar because it considered only recovery in strict liability and not in negligence. Celotex counters that if economic loss alone is not actionable under one tort doctrine, then it is not actionable under another.

The majority of courts which have considered this question have followed the decision of the California Supreme Court in *Seely v. White Motor Company*, 63 Cal.2d 9, 403 P.2d 145, 45 Cal.Rptr. 17 (1965), and held that purely economic losses are not ordinarily recoverable under tort law. See, e.g. *Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp.*, 626 F.2d 280 (3rd Cir.1980); *Iowa Elec. Light & Power Co. v. Allis-Chalmers Mfg. Co.*, 360 F.Supp. 25 (S.D.Iowa 1973); *Morrow v. New Moon Homes, Inc.*, 548 P.2d 279 (Alaska 1976); *Arrow Leasing Corp. v. Cummins Ariz. Diesel, Inc.*, 136 Ariz. 444, 666 P.2d 544 (1983); *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1975); *Chrysler Corp. v. Taylor*, 141 Ga. App. 671, 234 S.E.2d 123 (1977); *Moorman Mfg. Co. v. Nat'l Tank Co.*, 91 Ill.2d 69, 61 Ill.Dec. 746, 435 N.E.2d 443 (1982); *Price v. Gatlin*, 241 Or. 315, 405 P.2d 502 (1965); *Nobility Homes of Texas, Inc. v. Shivers*, 557 S.W.2d 77 (Tex.1977). This is certainly the traditional view of the law; indeed, historically the only tort action available to the disappointed purchaser suffering an intangible commercial loss was an action for fraud. *Prosser and Keeton on Torts* § 101, at 708 (5th ed. 1984). With the increase in products liability litigation, courts have frequently been faced with the question of whether intangible economic loss should be recoverable under negligence or strict liability. Central to the analysis of the *Seely* court and its successors has been the question of risk allocation.

Contract law permits the parties to negotiate the allocation of risk. Even where the law acts to assign risk through

implied warranties, it can easily be shifted by the use of disclaimers. No such freedom is available under tort law, which assigns risk as a matter of law. Once assigned, the risk cannot be easily disclaimed. This lack of freedom seems harsh in the context of a commercial transaction, and thus the majority of courts have required that there be injury to person or property before imposing tort liability.

The distinction that the law makes between recovery in tort for physical injuries and recovery in warranty for economic loss is hardly arbitrary. It rests upon an understanding of the nature of the responsibility a manufacturer must undertake when he distributes his products. He can reasonably be held liable for physical injuries caused by defects by requiring his products to match a standard of safety defined in terms of conditions that create unreasonable risks of harm or arise from a lack of due care. This is reasonable because the cost of injury may be an overwhelming misfortune to the person injured. It is a needless misfortune since the risk of that injury can be insured by the manufacturer and distributed among the public as a cost of doing business.

This rationale, however, does not justify requiring the consuming public to pay more for their products so that the manufacturer can insure against the possibility that some of his products will not meet the business needs of his customers. *Seely, supra,* at 403 P.2d 151, 45 Cal.Rptr. 23. Courts which have been presented with this question have also considered the impact of their decision on the Uniform Commercial Code. The UCC is generally regarded as the exclusive source for ascertaining when the seller is subject to liability for damages if the claim is based on an intangible economic loss and not attributable to physical injury to person or to a tangible thing other than the defective product itself. *Prosser and Keeton, supra,* § 95A, at 680. If intangible economic loss were actionable under a tort theory, the UCC provisions permitting assignment of risk by means of warranties and disclaimers would be rendered meaningless. It would be virtually

impossible for a seller to sell a product "as is" because if the product did not meet the economic expectations of the buyer, the buyer would have an action under tort law. The UCC represents a comprehensive statutory scheme which satisfies the needs of the world of commerce, and courts have been reluctant to extend judicial doctrines that might dislocate the legislative structure. *Henry Heide, Inc. v. W R H Products Co.,* 766 F.2d 105, 109 (3d Cir.1985).

This does not mean that courts have been unanimous in holding that intangible economic losses are not actionable under tort law. Watermark urges this court to follow the decision of the New Jersey Supreme Court in the case of *Santor v. A & M Karagheusian, Inc.,* 44 N.J. 52, 207 A.2d 305 (1965). In that case the court held that the responsibility of a manufacturer should be no different if the injury is an economic loss than it would be if the injury is personal. The court recognized that it was extending tort law into an area which was traditionally the domain of contract law. The court noted, however, that in order for contract law to afford a remedy to a plaintiff-consumer against a distant manufacturer, with whom he is not in privity, contract law would have to be so modified as to make it unrecognizable. The court reasoned that the more practical solution would simply be to broaden tort law to bring economic loss within its field of compensable injuries.

In the twenty years since *Santor,* its reasoning has been roundly criticized by legal commentators and has been rejected by most of the courts that have considered it. Recently, the New Jersey Supreme Court reviewed its *Santor* decision in the case of *Spring Motors Distributors, Inc. v. Ford Motor Company,* 98 N.J. 555, 489 A.2d 660 (1985), and has restricted its application to those cases in which the injured party is a consumer and not a commercial buyer. Under these circumstances, we do not think it likely that South Carolina would adopt the reasoning of *Santor.*

■ Though no South Carolina case addresses precisely the issue which confronts this court, Watermark cites the case of *Terlinde v. Neely*, 275 S.C. 395, 271 S.E.2d 768 (1980), for the proposition that South Carolina permits negligence actions solely for economic loss. In that case, the plaintiffs bought a house which was approximately four years old. They were not the original purchasers, but were the second family to own the house. The house was built on a landfill which had settled during the time that the first owners were in the house. The builder had paid the initial owners a settlement and obtained a release from them. After the Terlindes bought the house, the landfill began to settle again, causing serious damage to the house. The Terlindes sued the builder on theories of breach of warranty of merchantability and negligence. The builder was granted summary judgment. The South Carolina Supreme Court reversed the decision of the circuit court and permitted the action to proceed on those two theories of recovery.

Watermark argues that just as the Terlindes had a defective house, it has defective shingles, and that since the Terlindes were able to maintain an action in negligence, it also should be able to maintain such an action. Both the Terlindes and Watermark have suffered economic losses as a result of a defective product. We do not believe that the decision in *Terlinde* is applicable to the present case. South Carolina has been in the vanguard of providing relief to her citizens who purchase new homes which have latent defects. *Terlinde* is one of several cases in which the South Carolina Supreme Court has fashioned the principles which govern this emerging area of the law. We believe that the application of these principles is limited to litigation involving latent defects in housing. We also note that the UCC, which is so crucial to the analysis in *Seely* and its progeny, is not affected by *Terlinde*.

■ We find the decision of the South Carolina Supreme Court in *Gray v. Southern Facilities, Inc.*, 256 S.C. 558, 183 S.E.2d 438 (1971) to be more authoritative.

In *Gray*, the plaintiff owned a duplex apartment which had a creek running through its backyard. Upstream, Southern Facilities operated gasoline storage tanks. As a result of the defendant's negligence, gasoline flowed out of the tanks and into the stream. The gasoline was ignited by unknown means and burned upon the surface of the creek very near the plaintiff's property. The plaintiff's property suffered no physical damage, and neither he nor any member of his family was injured. The plaintiff's theory at trial was that the fire in the stream had made his property less valuable because potential buyers would be aware that such a fire could occur again. The plaintiff presented expert testimony to the effect that his property had been diminished in value by some ten percent. At the close of the plaintiff's case, the defendant was granted an involuntary nonsuit on the grounds that the plaintiff had not sustained any actual or physical damage. On appeal, the Supreme Court of South Carolina affirmed the decision of the circuit court. The Supreme Court held that a negligent act is not in itself actionable and only becomes so when it results in actual physical damage. Based on the decision of the South Carolina Supreme Court in *Gray* and for the foregoing reasons, we hold that, under South Carolina law, a negligence action cannot be maintained for an intangible economic loss.

In contemplation of the possibility that this court might adopt the reasoning in *Seely*, Watermark argues that it did suffer actual property damage: that removal of the defective shingles caused damage to the underlying felt or tar paper. As a result, this material had to be replaced before new shingles could be installed. Watermark argues that Celotex's negligence in manufacturing the shingles was the proximate cause of the damage to the underlying material. This, Watermark contends, is sufficient property damage to permit the action to continue in negligence.

■ We disagree. It is a standard and necessary procedure to replace the underlying felt when the old shingles are

removed. Were the felt not replaced, the abundance of nail holes in it would compromise the integrity of the roof. In the process of replacing a roof, it is as necessary to put down new felt as it is to secure it with new nails. Watermark's position that it suffered property damage because the old felt had to be replaced is as untenable as the argument that it suffered property damage because the old nails could not be used again. The cost of replacing the old felt is an incidental expense which may be recoverable in a warranty action, but it will not support an action for negligence.

### III

■ Celotex argues that it should be granted a new trial on the implied warranty theory alone. We agree. At trial it was Watermark's theory that Celotex knew that it had produced a large number of defective shingles and that Celotex decided it would be cheaper to market the shingles and then make a pro rata adjustment as the blisters appeared rather than recall and replace all of these shingles. To substantiate this theory at trial, Watermark introduced evidence of notice of an alleged blister problem, evidence of a blister problem with other shingles, evidence of Celotex's complaint handling procedure, evidence of Celotex's alleged failure to warn of the blisters, and evidence of other complaints regarding the shingles. This evidence was relevant to the negligence claim and punitive damages. It is not, however, relevant to Watermark's claims for breach of warranty, and it would not have been admitted had the trial proceeded solely on the warranty claim. For this reason we remand for a new trial on the implied warranty claim alone.

REVERSED AND REMANDED.