**CITY OF GREENVILLE, and
Greenville Water System,
Plaintiffs-Appellees,**

v.

**W.R. GRACE & CO.,
Defendant-Appellant.**

No. 86–2096.

United States Court of Appeals,
Fourth Circuit.

Argued April 8, 1987.

Decided Aug. 28, 1987.

Griffin B. Bell, Atlanta, Ga., (F. Barron Grier, III, Richardson, Plowden, Grier & Howser, Columbia, S.C., Shepard M. Remis, Kenneth A. Cohen, Goodwin, Procter & Hoar, Boston, Mass., on brief) for defendant-appellant.

Edward James Westbrook (Terry E. Richardson, Jr., Blatt & Fales, Barnwell, S.C., Daniel A. Speights, Hampton, S.C., on brief) for plaintiffs-appellees.

Before PHILLIPS, ERVIN and CHAPMAN, Circuit Judges.

ERVIN, Circuit Judge:

Defendant W.R. Grace & Co. ("Grace") appeals from an adverse judgment and from the district court's denial of its motions for judgment n.o.v. or a new trial in this case involving claims for negligence and breach of warranty arising out of the installation of asbestos fireproofing in the city hall in Greenville, South Carolina. Because we find no error in the proceedings below, we affirm the district court's judg-ment in favor of the plaintiffs, City of Greenville and Greenville Water System (hereinafter collectively referred to as "Greenville").

## I.

Grace is the manufacturer of a fireproofing product called Monokote. Until May 1971, all of the Monokote that Grace sold contained asbestos, which constituted about twelve percent of the finished product. In May 1971, Grace began selling a new type of Monokote, in which the asbestos had been replaced with shredded paper. Grace eliminated the asbestos from its Monokote in response to concerns and publicity about the health risks resulting from exposure to asbestos.

Greenville constructed the Greenville City Hall in 1971–72. Monokote was applied to the steel beams of the new building beginning in November 1971. Even though the asbestos-free Monokote had been on the market for approximately six months at that time, Grace supplied Greenville with the old Monokote, which contained asbestos.

Greenville sued Grace in 1985, asserting numerous claims arising out of the installation of the asbestos-containing Monokote in the city hall. All of Greenville's claims, except its claims for negligence and breach of warranty, were dismissed. The case proceeded to trial before a jury on the negligence and breach of warranty claims. The jury found in favor of Greenville on both claims and returned a verdict of $6.4 million actual damages and $2 million punitive damages.

Grace moved for judgment n.o.v. or a new trial. The district court denied Grace's motions.[1] See City of Greenville v. W.R. Grace & Co., 640 F.Supp. 559 (D.S. C.1986). This appeal followed.

## II.

■ One of Grace's primary contentions on appeal is that Greenville should not be permitted to assert a cause of action based

---

1. The district court provisionally granted Grace a new trial on the issue of damages unless Greenville agreed to a remittitur, which Greenville later did.

on the negligence of Grace, because Greenville has suffered only economic loss, for which tort recovery is not available. Grace's position is that absent some actual, physical injury to persons or property, which has not yet occurred, Greenville can recover its damages resulting from installation of the asbestos-containing Monokote only in a contract action for breach of warranty.

In deciding whether the facts of this diversity case provide a basis for a negligence claim in tort, we must apply South Carolina law. In *2000 Watermark Association v. Celotex Corp.*, 784 F.2d 1183, 1185 (4th Cir.1986), we considered the question "whether, under South Carolina law, a plaintiff can recover in negligence for injuries which are purely economic." *Watermark* involved a negligence claim that arose when a roof installed by defendants on plaintiff's condominium project blistered. The plaintiff in *Watermark* never claimed that the roof had actually leaked, but alleged only that the blistering had shortened the life expectancy of the roof and destroyed its aesthetic appeal, resulting in economic loss. We held that although the plaintiff could recover contract damages for breach of warranty with respect to the defective roof, South Carolina law would not permit it to assert a claim for negligence in tort. After noting that "the majority of courts have required that there be injury to person or property before imposing tort liability," *id.* at 1186, we observed:

> The distinction that the law makes between recovery in tort for physical injuries and recovery in warranty for economic loss is hardly arbitrary. It rests upon an understanding of the nature of the responsibility a manufacturer must undertake when he distributes his products. He can reasonably be held liable for physical injuries caused by defects by requiring his products to match a standard of safety defined in terms of conditions that create unreasonable risks of harm or arise from a lack of due care. This is reasonable because the cost of injury may be an overwhelming misfortune to the person injured. It is a needless misfortune since the risk of that

> injury can be insured by the manufacturer and distributed among the public as a cost of doing business.

> This rationale, however, does not justify requiring the consuming public to pay more for their products so that the manufacturer can insure against the possibility that some of his products will not meet the business needs of his customers.

*Id.*

Grace contends that under the rule discussed in *Watermark*, Greenville should not be permitted a tort recovery for its damages resulting from the installation of Monokote. Additionally, Grace relies upon the Supreme Court's recent decision in *East River Steamship Corp. v. Transamerica Delaval, Inc.*, 476 U.S. 858, 106 S.Ct. 2295, 90 L.Ed.2d 865 (1986). In *East River*, an admiralty case, the Supreme Court considered "whether a cause of action in tort is stated when a defective product purchased in a commercial transaction malfunctions, injuring only the product itself and causing purely economic loss." *Id.* at 2296. The negligence claims in *East River* arose when turbines installed on ships chartered by the plaintiffs malfunctioned, damaging only the turbines themselves. Noting that the failure of a product to function properly is the essence of a breach of warranty claim for expectancy damages, *id.* at 2300, the Supreme Court held that under admiralty law, "a manufacturer in a commercial relationship has no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself." *Id.* at 2302.

Neither the Supreme Court's decision in *East River* nor our decision in *Watermark* convinces us that the South Carolina courts would preclude Greenville from asserting a cause of action for negligence under the facts of this case. Indeed, we believe that those decisions are largely inapposite to the situation presented here. In both *East River* and *Watermark*, the defective products injured only themselves. There was no claim of any injury or threat of injury to persons or to other property. By contrast, the injury that resulted from the installa-

tion of Monokote in this case is the contamination of the Greenville City Hall with asbestos fibers, which endanger the lives and health of the building's occupants. In our opinion, this is not the type of risk that is normally allocated between the parties to a contract by agreement, unlike the risk of malfunctioning turbines at issue in *East River* or the risk of faulty roofing shingles involved in *Watermark.*

In *Watermark,* we indicated that a manufacturer whose product creates an unreasonable risk of harm may fairly be held liable when the product causes personal injury. We think that the South Carolina courts would be willing to extend tort liability to the manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment, thereby causing damage to the property owner who has installed the harmful product in his building. In this case, Greenville cannot be precluded from asserting a claim for negligence on the part of Grace simply because none of the occupants of the Greenville City Hall has yet developed an asbestos-related disease. Such diseases may not develop until decades after exposure to asbestos. We think that a plaintiff such as Greenville should not be required to wait until asbestos-related diseases manifest themselves before maintaining an action for negligence against a manufacturer whose product threatens a substantial and unreasonable risk of harm by releasing toxic substances into the environment.

Our review of relevant South Carolina authority bolsters our conviction that the South Carolina courts would permit Greenville to assert a claim for the negligence of Grace under the facts of this case. We understand that the South Carolina Supreme Court has given state-wide jurisdiction over asbestos property damage claims to one judge, the Honorable John Hamilton Smith. In an unpublished decision which the district court characterized as "applicable state-wide in South Carolina," *City of Greenville,* 640 F.Supp. at 564, Judge Smith ruled that property owners' claims for asbestos contamination of their buildings are actionable in tort. *See Spartanburg County School District Six v. Na-*

*tional Gypsum Co.,* No. 83–CP–42–1756 (S.C.Cir.Ct. Aug. 2, 1984). The court below also noted that three other federal district courts sitting in diversity in South Carolina have reached the same conclusion. *See Greenville County School District v. W.R. Grace Co.,* No. 82–3142–14 (D.S.C. July 29, 1985); *Spartanburg County School District Seven v. National Gypsum Co.,* No. 83–1744–14 (D.S.C. July 29, 1985); *Lexington County School District Five v. United States Gypsum Co.,* No. 82–2072–0 (D.S.C. April 2, 1984).

In view of these cases, and for the reasons discussed above, we conclude that the South Carolina courts would permit Greenville to recover against Grace on a negligence theory for its damages resulting from the installation of the asbestos-containing Monokote in the Greenville City Hall.

### III.

Grace also contends that the district court erred in denying its motion for judgment n.o.v. Grace argues that the evidence presented below was insufficient to support a finding that the Monokote was defective or that Grace knew of the dangers posed by Monokote. It is Grace's position that insufficiency of the evidence with respect to these two issues required the district court to grant judgment n.o.v. in its favor on both the negligence and breach of warranty claims.

Under South Carolina law, liability for a defectively designed product may be premised on a negligence, strict liability, or breach of warranty theory. *See Madden v. Cox,* 284 S.C. 574, 328 S.E.2d 108, 112 (Ct.App.1985). In order to prevail on a negligence or breach of warranty theory, a plaintiff must prove that "the product, as designed, was in a defective condition unreasonably dangerous to the user when it left the control of the defendant, and the defect caused his injuries." *Id.* An additional requirement in negligence cases is that the plaintiff must prove "that the manufacturer breached its duty to exercise reasonable care to adopt a safe design.... This burden may be met by showing that

the manufacturer was aware of the danger and failed to take reasonable steps to correct it." *Id.* Thus, in this case, if the evidence was insufficient to support a finding that the Monokote was defective, the district court should have granted judgment n.o.v. for Grace on both the negligence and breach of warranty claims. If the evidence was insufficient to support a finding that Grace was aware of the dangers posed by Monokote, the district court should have granted judgment n.o.v. for Grace on the negligence claim, since Grace could not be charged with failure to exercise reasonable care absent knowledge or reason to know of the risks associated with Monokote.

In reviewing the district court's denial of Grace's motion for judgment n.o.v., we must view the evidence presented below in the light most favorable to Greenville, the nonmoving party. *See, e.g., Murdaugh Volkswagen, Inc. v. First National Bank,* 801 F.2d 719, 725 (4th Cir.1986). Greenville is entitled to the benefit of all inferences that fairly can be drawn from the evidence. *See id.* We can reverse the district court's denial of Grace's motion for judgment n.o.v. only if the evidence presented at trial pointed so strongly in favor of Grace that reasonable minds could not find for Greenville. *See id.* at 726. Our review of the record in this case convinces us that the district court was correct in concluding that Grace had failed to meet this stringent standard for grant of judgment n.o.v.

■ Turning first to Grace's claims with respect to evidence of the defectiveness of Monokote, we find that there was ample evidence from which the jury could have concluded that the asbestos-containing Monokote was a defective product. Under South Carolina law, "[t]he test of whether a product is or is not defective is whether the product is unreasonably dangerous to the consumer or user given the conditions and circumstances that foreseeably attend use of the product." *Claytor v. General Motors Corp.,* 277 S.C. 259, 286 S.E.2d 129, 131 (1982). In determining whether a product is unreasonably dangerous, "numerous factors must be considered, including the usefulness and desirability of the product, the cost involved for added safety, the like-lihood and potential seriousness of injury, and the obviousness of danger." *Id.* at 265, 286 S.E.2d at 132.

Grace does not dispute that the utility factors in this risk/utility analysis weigh in favor of Greenville. A Grace research report prepared before the sale of the Monokote to Greenville revealed that including asbestos in the Monokote formula was neither very useful nor very desirable. The report identified the asbestos fiber contained in Monokote as a "potential health hazard." It stated that the primary function of asbestos in Monokote was to serve as a "yield increasing additive" (*i.e.,* a filler), the fire retardant properties of asbestos in Monokote being negligible.

It was neither difficult nor costly for Grace to improve the safety of Monokote by eliminating asbestos from the formula. Grace simply replaced the asbestos with shredded paper. Additionally, the danger posed by the presence of asbestos in the Monokote installed in the city hall was not obvious to Greenville.

Grace's primary contention is that there was not sufficient evidence of serious risk resulting from the asbestos in the city hall to support the jury's finding that the Monokote was unreasonably dangerous and thus defective. We think that since including asbestos in the Monokote formula had practically no utility, the jury would not have had to find a great degree of risk resulting from the asbestos to conclude that the Monokote was unreasonably dangerous. In any event, there was sufficient evidence from which the jury could have found that the likelihood and potential seriousness of injury that could result from the asbestos rendered the Monokote unreasonably dangerous and defective.

Greenville introduced evidence that it had had the city hall examined by experts in 1982, after it became concerned about the presence of asbestos in Monokote. The experts observed pieces of fallen Monokote and Monokote dust on the tops of the building's ceiling tiles and at the bottom of the ventilation and elevator shafts. Greenville's experts took samples from the office areas of the city hall and found that a

significant number of asbestos fibers had contaminated areas in which people worked. For example, the testing revealed 8,550,000 asbestos fibers per square foot in the carpet of one office area, and 170,000 asbestos fibers per square foot on the surface of one office computer.

Grace introduced evidence of air samples it had taken in the city hall which revealed much lower levels of asbestos contamination. At most, however, Grace's evidence merely created a jury question as to how much asbestos had been released into the city hall. From the evidence presented by Greenville, the jury reasonably could have found that the city hall was contaminated by significant amounts of asbestos, and that the asbestos had come from the fallen Monokote and Monokote dust.

There was also evidence from which the jury reasonably could have concluded that the asbestos released into the city hall by the Monokote posed a serious health risk for occupants of the building. Four experts testified that the asbestos-containing Monokote should be removed from the city hall. Dr. Frank, a medical expert, testified that exposure to asbestos can cause asbestosis and cancer. He further stated that it

was his opinion, and the opinion of the scientific community in general, that there is no level of exposure to asbestos below which there is no chance of developing an asbestos-related disease. Dr. Keys, the author of the Environmental Protection Agency's major guidance works on asbestos in buildings, testified that it is the Agency's position that there is no safe level of exposure to asbestos. Scientific reports corroborating the testimony of Dr. Frank and Dr. Keyes were introduced into evidence.[2]

In sum, there was sufficient evidence from which the jury reasonably could have concluded that the asbestos which the Monokote had released into the Greenville City Hall created health risks for the building's occupants. The jury could also reasonably have found that the asbestos-related health risks were so serious and so likely to manifest themselves that they outweighed the minimal utility of including asbestos in the Monokote formula. The jury further could have found that the risks associated with Monokote so far outweighed the product's utility as to render Monokote unreasonably dangerous. Because there was sufficient evidence to support these findings, the jury's conclusion

2. Grace contends that the evidence presented at trial was insufficient to support a finding that the levels of asbestos contamination in the Greenville City Hall posed a serious risk for the building's occupants. As Grace points out, Greenville did not introduce any epidemiological studies to show a correlation between exposure to asbestos in office buildings such as the city hall and development of asbestos-related diseases. Indeed, Dr. Frank testified that he did not believe that any such studies had ever been conducted. Greenville's expert testimony concerning the risks associated with exposure to asbestos at the relatively low levels found in the city hall was based on scientific inferences drawn from data showing a correlation between asbestos-related diseases and exposure to asbestos at relatively high levels.

It is Grace's position that the inferences drawn by Greenville's experts from studies involving exposure to asbestos at high levels cannot support a finding that the relatively low levels of asbestos contamination in the Greenville City Hall posed a health risk for the occupants of the building. We do not agree. Dr. Frank testified that in the absence of scientific studies concerning exposure to low levels of asbestos, one technique accepted in the scien-

tific community for predicting the risks associated with low-level exposures is to extrapolate the risk downward from results obtained in studies involving high-level exposures. We think that Greenville's expert testimony based on this accepted scientific technique could reasonably support a jury finding that the levels of asbestos contamination in the Greenville City Hall posed significant health risks for the building's occupants. Furthermore, we do not believe that Grace should be allowed to escape liability simply because no occupant of the city hall has yet developed an asbestos-related disease, or because there are, as yet, no epidemiological studies concerning the health risks associated with asbestos contamination of office buildings. Under the circumstances of this case, we agree with our fellow circuits that "products liability law does not preclude recovery until a 'statistically significant' number of people have been injured or until science has had the time and resources to complete sophisticated laboratory studies...." *Ferebee v. Chevron Chemical Co.*, 736 F.2d 1529, 1536 (D.C. Cir.), *cert. denied*, 469 U.S. 1062, 105 S.Ct. 545, 83 L.Ed.2d 432 (1984), *quoted with approval in Wells v. Ortho Pharmaceutical Corp.*, 788 F.2d 741, 745 (11th Cir.), *cert. denied*, —— U.S. ——, 107 S.Ct. 437, 93 L.Ed.2d 386 (1986).

that Monokote was a defective product will not be disturbed on appeal.[3]

■ In our opinion, the evidence was also sufficient to support a finding that Grace knew of the risks associated with Monokote at the time it sold the product to Greenville but failed to take reasonable steps to correct the danger, thus rendering Grace liable to Greenville for negligence. Grace contends that it could not have been aware of the dangers of Monokote at the time of the sale to Greenville, because there was no scientific consensus concerning the effects of exposure to low levels of asbestos at that time. This argument is unconvincing in view of the evidence concerning the state of Grace's actual knowledge about the risks associated with asbestos at the relevant time.

The evidence showed that as early as 1969, Grace had begun searching for an acceptable substitute for asbestos in Monokote. Grace's desire to eliminate asbestos from the Monokote formula arose, in part, in reaction to growing public concern over the dangers of exposure to asbestos. In 1969, a Grace official attended a lecture given by a noted asbestos researcher and prepared a report summarizing the contents of the lecture. The report stated:

After noting the widespread concentration of [asbestos] fibers around major office structures, ... [the lecturer] stressed the hazards to the general public of this pollution of the air. Also, he noted the concern of possible long-term danger to building occupants from prolonged minute dusting of fibers through the building's air distribution systems.

The report characterized the charges concerning the dangers of asbestos exposure as "very serious," and it noted that "responsible people are listening all across the country."

By April 1970, Grace had developed and begun testing two asbestos-free Monokote formulas. Later that year, Grace prepared a report dealing with its research and development program for asbestos-free Monokote. The report noted that the performance of the asbestos-containing Monokote was "questionable," both because of the health risks associated with asbestos, and because the Monokote often failed to bond properly to the surfaces to which it was applied.

By May 1971, Grace had begun selling its new asbestos-free Monokote commercially. Grace began shipping Monokote to Greenville in November 1971. All of the Monok-

---

3. Grace takes issue with two of the district court's evidentiary rulings as they relate to proof of the defectiveness of Monokote. Grace claims that the district court erred in admitting into evidence the National Emission Standards for Hazardous Air Pollutants ("NESHAPS"), federal regulations that were promulgated in 1973, after the sale of the Monokote by Grace to Greenville. Among other things, these regulations require the removal of friable asbestos materials before buildings are renovated or demolished. See 40 C.F.R. § 61.147(a) (1986). Grace contends that the NESHAPS were improperly admitted to prove the defectiveness of Monokote. Our review of the record, however, indicates that the NESHAPS were relevant and admissible for another purpose: to prove that Greenville would eventually be required to remove the Monokote from the city hall and thus would incur damages. To the extent that the NESHAPS may have been admitted to prove the defectiveness of Monokote, any error that may have been committed was harmless. As discussed in the text of this opinion, there was ample evidence, apart from the NESHAPS, from which the jury reasonably could have concluded that the Monokote was a defective product.

Grace's second claim of error with respect to the district court's evidentiary rulings is that the district court erred in refusing to admit Grace's "comparative risk" evidence. After offering evidence concerning the miniscule risk posed by the low levels of asbestos at the Greenville City Hall, Grace sought to introduce evidence of the risks posed by other products more familiar to the jury, such as peanut butter and diet soft drinks. The purpose of this proffered evidence was to put the risks associated with exposure to low levels of asbestos into a perspective that the jury could understand.

The district court excluded Grace's "comparative risk" evidence under Fed.R.Evid. 403, on the ground that its probative value was substantially outweighed by the risk of jury confusion and undue delay. At oral argument, counsel for Grace conceded that its claim of error with respect to the exclusion of this evidence lacked merit. We agree with counsel's assessment, being of the view that the district court acted within its discretion in excluding the "comparative risk" evidence.

ote that Grace sold to Greenville contained asbestos.

We think that the jury reasonably could have concluded from this evidence that Grace knew of the risks associated with the asbestos-containing Monokote when it sold the product to Greenville, and that Grace failed to take reasonable steps to eliminate those risks. The evidence indicated that Grace knew both of the health risks resulting from exposure to asbestos and of the likelihood that the Monokote would release asbestos fibers into the Greenville City Hall because of its failure to bond properly.

Because the evidence presented at trial was sufficient to support the jury's findings that the Monokote was a defective product and that Grace knew of the dangers it posed, we affirm the district court's denial of Grace's motion for judgment n.o.v. on the negligence and breach of warranty claims.

## IV.

Grace's third contention on appeal relates to the jury's award of compensatory and punitive damages. Grace claims that the award of compensatory damages was impermissibly speculative and without evidentiary support. Additionally, Grace contends that the punitive damages award was unsupported by the evidence and tainted by faulty jury instructions. None of these arguments has merit.

After Greenville agreed to a remittitur of the compensatory damages award, the total amount of compensatory damages awarded to Greenville was $4.809 million. The largest component of this award was Greenville's $3.849 million cost of removing the Monokote from the city hall in a program phased over twelve years. Greenville was also awarded $975,000 to cover the projected cost of an operations and maintenance program to maintain the Monokote in safe condition during the period before all of the Monokote could be removed from the building. Grace contends that the award of removal and maintenance costs in these amounts was impermissibly speculative, because the evidence did not establish that Greenville would have to remove the Monokote, or that it would take twelve years for Greenville to do so.

Grace's first argument is that the jury was improperly allowed to rely on the National Emission Standards for Hazardous Air Pollutants ("NESHAPS") in awarding Greenville the cost of removing the Monokote. The NESHAPS require the removal of friable asbestos materials, such as Monokote, before buildings containing those materials are renovated or demolished. *See* 40 C.F.R. § 61.147(a) (1986). Grace contends that these regulations were irrelevant, because there was no evidence that Greenville actually planned to renovate or demolish the city hall at any time in the future.

This strikes us as a specious argument. It is obvious that the city hall will not last forever. It will have to be renovated or demolished at some time in the future, and when that day arrives, Greenville will be required to remove the Monokote from the building, if it has not already done so.

The Mayor of Greenville testified that the city realized that the NESHAPS would require it to remove the Monokote at some time. He further stated that the city had adopted a plan for floor-by-floor removal of the Monokote over a twelve-year period. The phased removal plan was adopted because the city felt that it was the most feasible approach financially, and the approach least likely to disrupt operations in the city hall. When adjusted for inflation at the time of trial, the projected removal cost under Greenville's plan was $3.849 million.

The district court found that an award of Greenville's projected cost of removing the Monokote in the amount of $3.849 million was amply supported by the evidence. We agree that the evidence presented by Greenville provided a sufficient basis for an award of damages in this amount, particularly in view of the fact that Grace presented no contrary evidence concerning projected removal costs.

Grace's second argument with respect to the award of compensatory damages is that the award of $975,000 for Greenville's operations and maintenance costs was improper. This amount was awarded to compensate Greenville for the

cost of maintaining the Monokote in the city hall in a safe condition during the twelve-year period before all of the Monokote could be removed under Greenville's phased removal plan. Grace claims that the award of operations and maintenance costs based on a twelve-year period was improper, because Greenville could evacuate the city hall and remove all of the Monokote in as little as eighteen months.

In our view, Greenville's theoretical ability to remove the Monokote from the city hall in eighteen months does not require reduction or elimination of the award of projected operations and maintenance costs under Greenville's twelve-year removal plan. Greenville adopted the twelve-year plan because it found phased removal to be the most feasible and least disruptive approach. Under these circumstances, we see nothing wrong in requiring Grace to pay the operations and maintenance costs that Greenville reasonably expects to incur during the twelve-year removal period. In our opinion, Greenville should not be required to evacuate the city hall and disrupt its operations simply because removal of the Monokote over an eighteen-month period might be financially advantageous to Grace.

Grace attacks the award of $2 million in punitive damages on two grounds. First, Grace claims that the evidence was insufficient to support a finding that it had engaged in the kind of culpable conduct for which punitive damages may be awarded. We find this argument unconvincing.

■ Under South Carolina law, punitive damages may be recovered when a tortfeasor acts willfully, wantonly, or in reckless disregard of the rights of another. *See, e.g., Camp v. Components, Inc.,* 285 S.C. 443, 330 S.E.2d 315, 316 (Ct.App.1985); *Fox v. Munnerlyn,* 283 S.C. 490, 323 S.E.2d 68, 69 (Ct.App.1984). Grace contends that the evidence was insufficient to support a finding that it had acted willfully, wantonly, or recklessly, because there was no evidence that it had sold the asbestos-containing Monokote to Greenville in conscious disregard of known dangers posed by the Monokote. As more fully discussed in part III of this opinion, however, there was ample evidence that Grace

knew of the health risks associated with exposure to asbestos at the time that it sold the Monokote to Greenville. There was also evidence that Grace knew that Monokote often failed to bond properly, thus creating a danger that asbestos fibers would be released into the Greenville City Hall. Finally, the evidence showed that at the time Grace sold the asbestos-containing Monokote to Greenville, it had already developed and begun selling an asbestos-free Monokote in response to concerns and publicity about the health risks associated with exposure to asbestos. From this evidence, the jury reasonably could have concluded that Grace had acted willfully, wantonly, or recklessly in selling the asbestos-containing Monokote to Greenville in conscious disregard of known risks associated with the presence of asbestos in the product.

■ Grace's final argument is that the award of punitive damages resulted from faulty jury instructions given by the district court. Initially, the court charged the jury that it could award punitive damages if it found Grace's conduct to have been reckless. Counsel for Grace then informed the court that the jury should have been instructed that it could award punitive damages if it found Grace's conduct to have been willful, wanton, or reckless. In response to questioning by the district court, counsel for Grace stated that the addition of the words "willful" and "wanton" to the jury charge would cure his objection. The district court then recalled the jury and gave the punitive damages instruction requested by Grace.

Grace claims that the district court's earlier, incorrect instruction on punitive damages led the jury to believe that it could award such damages based on insufficiently culpable conduct on the part of Grace. Grace further contends that the later, correct jury charge did not cure the harm done by the earlier charge. We disagree. In our view, the district court's curative instruction eliminated any prejudice to Grace that may have resulted from the initial instruction. Furthermore, we are particularly unsympathetic to Grace's claim of error with respect to the jury instruction,

since the district court gave the curative instruction requested by Grace, and counsel for Grace informed the court that this instruction would cure his objection to the earlier charge.

## V.

Finding no error in the proceedings below, we affirm the judgment of the district court for the reasons stated in this opinion.

AFFIRMED.