**Richard GROSS, et al.**

v.

**KING DAVID BISTRO, INC.**

Civil No. JFM–97–4037.

United States District Court,
D. Maryland.

Feb. 1, 2000.

Jeffrey R. Scholnick, Baltimore, MD, Jeffrey M. Kornblau, Lynn Sare Kornblau, Kornblau & Kornblau, P.C. Jenkintown, PA, for plaintiffs.

Heather S. O'Connor, Eccleston & Wolf, Baltimore, MD, for King David Bistro, Inc., defendant.

Helen Elizabeth Bowlus, Office of Atty. Gen., Baltimore, MD, J. Joseph Curran, Jr., Office of Atty. Gen., Baltimore, MD, for Maryland State Dept. of Health and Mental Hygiene, defendant.

Michael Mehdi Rafi, Church & Houff, PA, Baltimore, MD, for Shmul Scott Feldman, Chani Amy Feldman, defendants.

## MEMORANDUM

MOTZ, Chief Judge.

Plaintiffs, Richard Gross, June Gross, Elaine Gross, and Steven Gross, have brought suit against defendant King David Bistro, Inc., ("KDB"), alleging negligence, breach of warranty, and strict liability. Defendant has filed a motion in limine to prohibit the testimony of Dr. Bruce Hoffman and motion for partial summary judgment. The motions will be granted.

Plaintiffs are residents of Pennsylvania who attended an event at the Southeast Hebrew Congregation Synagogue in Silver Spring, Maryland on April 21, 1996. Defendant KDB provided food for the event, including two trays of tuna fish salad. Approximately thirty-five of the seventy-five guests at the event, including plaintiffs, became ill with shigellosis, which, according to plaintiffs' evidence, was caused by the presence of the infectious organism Shigella sonnei in the tuna fish salad. Shigellosis is associated with food-borne illness when an individual infected with the organism does not wash his or her hands after bathroom use, that individual touches food with fecally contaminated hands, and the food is then consumed by another person. The parties dispute whether the tuna

fish salad became contaminated before or after it left KDB's control.

On April 23, 1996, two days after the event, plaintiff June Gross complained of abdominal pain, diarrhea, achiness, and malaise. She was admitted to Abington Memorial Hospital where she was diagnosed with Shigella sonnei. On May 5, 1997, about one year after her release from the hospital for the shigellosis infection and a subsequent pulmonary embolus, Gross visited her rheumatologist, Dr. Bruce Hoffman, who has been treating Gross for connective tissue disease since 1994. Gross was experiencing fatigue, arthralgia, erythema, and burning in her hands and feet. After another visit with Hoffman in May, Gross saw Dr. Sharon Kolasinski. Gross continued to complain of chronic fatigue, occasional diffuse achiness, and numbness and tingling in her hands and feet. Kolasinski diagnosed Gross as having fibromyalgia syndrome.

Plaintiffs seek to introduce Hoffman's expert opinion that Gross' shigella infection caused the fibromyalgia. KDB argues that since there are no scientific studies or medical reports that support Hoffman's theory, his testimony should be inadmissible.

## I.

The introduction of expert testimony is governed by Fed.R.Evid. 702, which requires judges to perform a gatekeeping function to assess whether proffered expert testimony is both reliable and relevant. *See Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 589, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). The *Daubert* Court suggested four factors to guide lower courts in assessing the reliability of expert testimony. The factors that may bear on the reliability of an expert's testimony include:

> Whether a theory or technique can be (and has been) tested; whether it has been subjected to peer review and publication; whether, in respect to a particular technique, there is a high known or

potential rate of error and whether there are standards controlling the technique's operation; and whether the theory or technique enjoys general acceptance within a relevant scientific community.

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 119 S.Ct. 1167, 1175, 143 L.Ed.2d 238 (1999) (quoting *Daubert*, 509 U.S. at 592–94, 113 S.Ct. 2786) (internal quotations omitted). KDB maintains that since there are no peer reviewed published reports or epidemiological studies linking shigella to fibromyalgia, Hoffman's theory cannot be admissible under this multifactored reliability test. Gross admits that there are no published articles in the medical literature that directly link shigellosis and fibromyalgia. Given the absence of published articles or epidemiological reports supporting Hoffman's theory, KDB contends that his proposed testimony fails each one of the *Daubert* factors and is inadmissible.

Rather, KDB has construed *Daubert* too narrowly. The *Daubert* factors cannot be applied mechanically in the particular context of a given case. District judges must endeavor to assess the validity of the scientific testimony based on the unique situations involved in each case. *See Kumho Tire*, 119 S.Ct. at 1175–76. Moreover, in *Benedi v. McNeil–P.P.C., Inc.*, 66 F.3d 1378 (4th Cir.1995), the Fourth Circuit has indicated that "[u]nder the *Daubert* standard, epidemiological studies are not necessarily required to prove causation, as long as the methodology employed by the expert in reaching his or her conclusion is sound." *Benedi*, 66 F.3d at 1384. Plaintiffs contend that Hoffman's opinion is reliable since it is based on studies in the medical literature, the temporal relationship between Gross' infection and the onset of fibromyalgia, a differential diagnosis of Gross' condition, and his experience and training as a rheumatologist. Therefore, in determining the reliability of Hoffman's testimony, I will evaluate his opinion in light of the methodology he employed.

## A.

In the absence of medical reports directly linking shigellosis and fibromyalgia, plaintiffs assert that Hoffman's medical opinion is informed by an emerging body of scientific literature examining whether infections similar to shigellosis cause fibromyalgia. Plaintiffs argue that under the Fourth Circuit's decisions in *Westberry v. Gislaved Gummi AB*, 178 F.3d 257, 262 (4th Cir.1999) and *City of Greenville v. W.R. Grace & Co.*, 827 F.2d 975 (4th Cir. 1987) experts are permitted to offer opinions based on inferences drawn from similar scientific studies even though the studies are not directly on point.[1]

In *Westberry*, the expert witness sought to testify that the plaintiff suffered a sinus condition due to inhalation of talc. There was no scientific literature to support the conclusion that inhalation of talc could cause plaintiff's sinus disease. Both parties agreed, however, that inhalation of high levels of talc irritates mucous membranes. In addition, it was undisputed that sinuses are mucous membranes. The defense expert even conceded that high levels of talc could cause plaintiff's sinus problems. Moreover, the defense attorney made the same concession in his opening by stating "how much talc got in the air? If there was a lot of talc, then yeah, it could cause some kind of problem with mucous membranes. But there wasn't a whole lot of talc." *Westberry*, 178 F.3d at 264 n. 2. Clearly, the medical disagreement regarded not whether talc could cause irritation in sinuses, which are mucous membranes, but only how much talc was necessary to cause sinus irritation.

In *City of Greenville*, the city brought suit after defendant supplied building materials containing asbestos for use in constructing city hall. Despite the lack of scientific literature relating to low level asbestos exposure, plaintiff's expert was permitted to opine that even very low levels of asbestos could cause serious harm.

The expert found support from "extrapolat[ing] the risk downward from results obtained in studies involving high-level exposures." *City of Greenville*, 827 F.2d at 980 n. 2. The defendant objected to the introduction of this expert testimony because there were no epidemiological studies concerning asbestos at such low levels. The court rejected the defendant's argument and found the expert opinion reliable. Again, as in *Westberry*, the scientific dispute over the expert's opinion concerned the level of exposure necessary to cause harm, not causation itself.

In short, the inferential steps taken by the experts in *Westberry* and *City of Greenville* were sound and trustworthy. In contrast, the opinion expounded by Hoffman in this case is far removed from the underlying medical studies. First, plaintiffs point to evidence in the literature stating that shigellosis can cause rheumatic disorders. For instance, Hoffman relies on a medical text that notes "*Shigella* infections have also been associated [with] chronic rheumatoid diseases including Reiter's syndrome and reactive arthritis." Pls.' Resp. Ex. A, A.H. Varnam, *Foodborne Pathogens: An Illustrated Text* 92 (1991). However, another source relied on by Hoffman suggests that this view may be an over-generalization. In a governmental report, the Department of Health & Human Services states that those infected with shigella "usually completely recover, although it may be several months before their bowel habits are entirely normal. About 3% of persons who are infected with one type of Shigella, *Shigella flexneri*, will later develop pains in their joints, irritation of the eyes, and painful urination. This is called Reiter's syndrome." Pls.' Resp. Ex. A, Department of Health & Human Services, *Preventing Diarrheal Disease: Questions and Answers about Shigellosis* 2–3 (1994). Gross, however, was infected with the more common and less severe bacteria, Shigella sonnei.

---

1. Plaintiffs also rely on *Benedi*. Unfortunately, the *Benedi* court's discussion of the ex- pert's methodology is insufficient to be helpful in this case.

Hoffman's analysis starts with this fact: Gross was infected by Shigella sonnei, a type of shigellosis. His second premise is that Shigella flexneri, a more severe type of shigellosis, is thought to cause Reiter's syndrome and other rheumatic conditions in a small percentage of those infected. Therefore, Hoffman concludes, since fibromyalgia is also a rheumatic syndrome, that the Shigella sonnei is its most likely cause. This theory depends on numerous logical shortcuts and inferential leaps. Compared with the straightforward analysis in *Westberry* and *City of Greenville,* his opinion is greatly suspect and overly speculative. It is an unreliable basis for expert testimony.

Plaintiffs also argue that there are medical studies that show infectious diseases may cause fibromyalgia. Plaintiffs submit three studies purporting to show a causal link between an infectious disease and fibromyalgia. However, far from solidifying Hoffman's proposed testimony, these studies only support the conclusion that the pathogenesis of fibromyalgia remains in doubt. For instance, in one article the authors begin their discussion by noting that "[d]espite intensive research, major gaps in our understanding of the pathogenesis of FS still remain." Pls.' Resp. Ex. A, Dan Buskila et al., *Fibromyalgia in Hepatitis C Virus Infection,* 157 Archives Internal Med. 2497, 2497 (1997). While finding that there was a high prevalence of fibromyalgia observed in patients infected with the Hepatitis C virus, the authors state that "there is no direct evidence of a causal association of an infectious agent and FS" and that "[f]uture research is needed to further elucidate the possible role of infections in the pathogenesis of FS." *Id.* at 2497, 2500. Similarly, another study states that "the pathogenesis of rheumatic conditions associated with HIV infection remains unknown. Rheumatic disorders may be the result of direct effects of HIV or an immune response to HIV infection or result from confounding factors." Pls.' Resp. Ex. A, Robert W. Simms et al., *Fibromyalgia Syndrome in Patients Infected with Human Immuno-*

*deficiency Virus,* 92 Am. J. Med. 368, 368 (1992). This study suggests that depression, substance use and chronic infections may be possible explanations for the association between fibromyalgia and HIV infection. Only the researchers in an article about Lyme disease actually posit that the disease may cause fibromyalgia. Even in this study the researchers cautiously note that the "cause of this syndrome is not known, and no specific tissue or laboratory abnormality has been identified." Pls.' Resp. Ex. A, Hal Dinerman & Allen C. Steere, *Lyme Disease Associated with Fibromyalgia,* 117 Annals Internal Med. 281, 281 (1992). Ultimately, they conclude that "[w]e believe that in a small percentage of patients, infection with [Lyme disease] may trigger fibromyalgia." *Id.* at 285.

From these studies, Hoffman would testify that Gross' fibromyalgia was caused by the shigellosis infection. At this time the empirical data is simply too nascent and tepid to support his conclusion. The medical studies themselves acknowledge that the causes of fibromyalgia are unknown. At best, these studies only suggest that there is an association between infections and fibromyalgia. However, as one of the studies discusses, there are many confounding factors that muddle even this association. Even assuming *arguendo* that the articles suggest a causal relationship with these specific viral and spirochete infections, Hoffman fails to explain why shigella bacteria is analogous and might cause a similar outcome. His opinion is simply too far removed from the foundational evidence. Therefore, I must "conclude that these is simply too great an analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner,* 522 U.S. 136, 118 S.Ct. 512, 519, 139 L.Ed.2d 508 (1997).

**B.**

In addition, Hoffman relies on the temporal connection between Gross' shigella infection and her fibromyalgia. However,

there is no close temporal connection. Gross was diagnosed with fibromyalgia by Kolasinski over a year after contracting the shigella bacteria.[2] Furthermore, Hoffman's records prior to Gross' shigella infection state that she experienced "aches and pain in multiple areas," as well as "fatigue ... increase[d] need for sleep," and a "headache." Pls.' Resp. Ex. C, Hoffman Progress Note, March 7, 1996 & Letter to Dr. Stockard, June 30, 1995. These pre-shigella symptoms are consistent with fibromyalgia. Cf. Wolfe, supra, at 535 (describing "characteristic symptoms, including non-restorative sleep, fatigue, stiffness, mood disturbance, irritable bowel syndrome, headache"). In fact, Hoffman writes in his March 7, 1996 progress note on Gross that "I still believe there may be some degree of overlying fibromyalgia." Pls.' Resp. Ex. C. So, over a month before the shigella incident, Hoffman himself thought that Gross might have fibromyalgia. Therefore, it is unclear when Gross really began suffering from fibromyalgia. Simply because she was diagnosed with fibromyalgia syndrome subsequent to the infection is not convincing.

### C.

Plaintiffs also rely on Hoffman's use of the clinical technique known as "differential diagnosis,"[3] which included Gross' lack of response to steroid treatment. According to Hoffman, Gross' failure to respond to steroid treatment ruled out her pre-existing connective tissue disorder as the cause of her symptoms. Plaintiffs argue that, under Westberry, differential diagnosis is a permissible basis for expert testimony. The Fourth Circuit stated "that a reliable differential diagnosis provides a valid foundation for an expert opinion." Id. at 263 (emphasis added). Although Gross' failure to respond to steroid treatment may be sufficient to rule out connective tissue disorder, it does nothing to demonstrate that shigellosis was the cause of her symptoms. Standing alone, her unresponsiveness to steroid treatment is not a reliable foundation for expert opinion.

### D.

Finally, plaintiffs assert that Hoffman's training and experience qualify him to testify. KDB does not contest Hoffman's qualifications as a rheumatologist or immunologist. However, Hoffman's medical experience and training are not, in themselves, sufficient to support his expert opinion. The Daubert analysis "commands that in court, science must do the speaking, not merely the scientist." Cavallo v. Star Enter., 892 F.Supp. 756, 761 (E.D.Va. 1995). His qualifications are only a threshold consideration in determining his ability to testify. Since his proposed testimony is unreliable, his experience and training are immaterial.[4]

---

**2.** Hoffman saw Gross twice in the month preceding Kolasinski's diagnosis of Gross' fibromyalgia. In those visits to Hoffman, Gross' fibromyalgia remained undetected. Evidently, Hoffman still believed Gross' symptoms were primarily attributable to her connective tissue disease. Indeed, fibromyalgia is often misdiagnosed or mistreated as connective tissue disease. See Frederick Wolfe, The Fibromyalgia Syndrome: A Consensus Report on Fibromyalgia and Disability, 23:3 J. Rheumatology 534, 535 (1996) (noting "[s]ome persons with FM appear to have features suggestive of connective tissue disorders").

**3.** "Differential diagnosis, or differential etiology, is a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." Westberry, 178 F.3d at 262.

**4.** I also note that, not surprisingly, given the current state of scientific and medical studies, other courts have been hesitant in permitting expert testimony regarding the causation of fibromyalgia. For instance, in Black v. Food Lion, Inc., 171 F.3d 308 (5th Cir.1999) the Fifth Circuit found that the causal link between plaintiff's head trauma suffered in a slip-and-fall accident and her subsequent diagnosis with fibromyalgia was too speculative. Id. at 314 (finding that "neither [the expert] nor medical science knows the exact process that results in fibromyalgia or the factors that trigger the process"). The Fifth Circuit found the expert's opinion inadmissible even though head trauma, along with

## II.

Absent Dr. Hoffman's proposed expert testimony, Gross has no evidence supporting her claim against KDB for damages attributable to fibromyalgia. Since there is no genuine issue of material fact concerning this claim, KDB's motion for partial summary judgment will be granted. *See* Fed.R.Civ.P. 56.

For these reasons, defendant's motion in limine to prohibit testimony of Dr. Bruce Hoffman and motion for partial summary judgment is granted. A separate order effecting this ruling is entered herewith.

myriad other factors, has been floated as a possible cause of fibromyalgia.