Crescent Univ. City Venture, LLC v. AP Atl., Inc., 2019 NCBC 48.

STATE OF NORTH CAROLINA

MECKLENBURG COUNTY

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

             Plaintiff,

v.

AP ATLANTIC, INC. d/b/a
ADOLFSON & PETERSON
CONSTRUCTION,

             Defendant,

v.

MADISON CONSTRUCTION
GROUP, INC.; TRUSSWAY
MANUFACTURING, INC.; T. A.
KAISER HEATING & AIR, INC.;
SEARS CONTRACT, INC.; MACEDO
CONTRACTING CO.; WHALEYS
DRYWALL, LLC; STALLINGS
DRYWALL, LLC; MAYNOR PI, INC.;
MATUTE DRYWALL, INC.;
INTERIOR DISTRIBUTORS, A
DIVISION OF ALLIED BUILDING
PRODUCTS, CORP.; MANUEL
BUILDING CONTRACTORS, LLC;
EAGLES FRAMING COMPANY,
INC.; DIAZ CARPENTRY, INC.;
SOCORRO CASTILLE MONTLE;
and GUERRERO CONSTRUCTION
PRO, INC.

             Third-Party
             Defendants.

IN THE GENERAL COURT OF JUSTICE
SUPERIOR COURT DIVISION
15 CVS 14745 (Master File)

**ORDER AND OPINION ON MOTIONS
FOR SUMMARY JUDGMENT
(18 CVS 1642)**

MADISON CONSTRUCTION
GROUP, INC.,

> Third-Party
> Plaintiff,

v.

MANUEL BUILDING
CONTRACTORS, LLC,

> Fourth-Party
> Defendant.

---

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

> Plaintiff,

v.

ADOLFSON & PETERSON, INC.,

> Defendant.

16 CVS 14844 (Related Case)

---

CRESCENT UNIVERSITY CITY
VENTURE, LLC,

> Plaintiff,

v.

TRUSSWAY MANUFACTURING,
INC.; and TRUSSWAY
MANUFACTURING, LLC,

> Defendants.

18 CVS 1642 (Related Case)

---

1.    **THIS MATTER** is before the Court upon motions titled (i) Defendant

Trussway Manufacturing, LLC's ("Trussway") Motion for Summary Judgment as to

Crescent's Negligence Claim ("Trussway's Motion"); (ii) Third-Party Defendant

Madison Construction Group, Inc.'s ("Madison") Motion for Summary Judgment in 18-CVS-1642 ("Madison's Motion"); (iii) Third-Party Defendant Sears Contract, Inc.'s ("Sears") Motion for Summary Judgment ("Sears' Motion"); and (iv) Third-Party Defendant T.A. Kaiser Heating & Air, Inc.'s ("T.A. Kaiser") Motion for Summary Judgment as to Trussway Manufacturing Inc.'s Claims in 18-CVS-1642 ("T.A. Kaiser's Motion") (collectively, with one or more of the other summary judgment motions, the "Motions for Summary Judgment") in the above-captioned case.

2. For the reasons stated herein, the Court **GRANTS** Trussway's Motion and **DENIES** the remaining motions as moot.

> *Troutman Sanders LLP, by Kiran H. Mehta, for Plaintiff Crescent University City Venture, LLC.*
>
> *Fox Rothschild LLP, by Jeffrey P. MacHarg, and Pagel, Davis & Hill, P.C., by Martyn B. Hill and Kent J. Pagel, for Defendant Trussway Manufacturing, LLC f/k/a Trussway Manufacturing, Inc.*
>
> *Baucom, Claytor, Benton, Morgan & Wood, P.A., by Brian E. Wolfe and Robert C. Gunst, Jr., for Third-Party Defendant Madison Construction Group, Inc.*
>
> *Goodman McGuffey LLP, by W. James Flynn, for Third-Party Defendant T.A. Kaiser Heating & Air, Inc.*
>
> *Hedrick Gardner Kincheloe & Garofalo LLP, by David L. Levy and Adam R. DeNobriga, for Third-Party Defendant Sears Contract, Inc.*

Bledsoe, Chief Judge.

I.

BACKGROUND

3. The question posed to the Court in this case is whether, under North Carolina law, a commercial property owner who contracts for the construction of a

building, and thereby possesses a bargained-for means of recovery against a general contractor, may nevertheless seek to recover in tort for its economic loss from a subcontracted manufacturer of building materials with whom the property owner does not have contractual privity. Because North Carolina's economic loss rule requires negligence claims to be based upon the violation of an extra-contractual duty imposed by operation of law, and simultaneously recognizes that parties generally do not owe each other a duty of care to prevent economic loss, the Court concludes that the answer to this question is no.

A.    Factual Background

4.    The Court does not make findings of fact when ruling on motions for summary judgment, but "it is helpful to the parties and the courts for the trial judge to articulate a summary of the material facts which he considers are not at issue[.]" *Hyde Ins. Agency, Inc. v. Dixie Leasing Corp.*, 26 N.C. App. 138, 142, 215 S.E.2d 162, 165 (1975).

5.    This case arises from the construction of a multi-building apartment complex (the "Project") near the University of North Carolina at Charlotte ("UNC Charlotte") and a dispute over alleged floor truss defects that developed shortly after the Project's completion. Plaintiff Crescent University City Venture, LLC ("Crescent") was the owner and developer of the Project. (Crescent Univ. City Venture, LLC's Resp. Opp'n Trussway's Mot. Summ. J. Crescent's Negligence Claim 1 [hereinafter "Crescent's Opp'n Br."], ECF No. 555; Trussway Mfg., LLC's Br. Supp. Mot. Summ. J. Crescent's Negligence Claim Ex. I, at 1 [hereinafter "General

Conditions"], ECF No. 549.9.) Trussway was the manufacturer who supplied trusses for the Project's construction. (Trussway Mfg., LLC's Br. Supp. Mot. Summ. J. Crescent's Negligence Claim 6 [hereinafter "Trussway's Br. Supp."], ECF No. 548; Trussway's Br. Supp. Ex. G, at 1 [hereinafter "Purchase Order"], ECF No. 549.7.)

6. In 2012, Crescent entered into a contract with general contractor AP Atlantic, Inc. d/b/a Adolfson & Peterson Construction ("AP Atlantic") whereby AP Atlantic agreed to construct an apartment complex on Crescent's property located near UNC Charlotte. (*See generally* General Conditions; Trussway's Br. Supp. Ex. J [hereinafter "Standard Form Agreement"], ECF No. 549.10.) AP Atlantic then entered agreements with several subcontractors to facilitate the construction of the Project. These included (i) Madison, the subcontractor responsible for providing and installing wood framing, including floor trusses, at the Project, (*see generally* Trussway's Br. Supp. Ex. K, ECF No. 549.11); (ii) Sears, the Project's drywall subcontractor, (*see generally* Sears Contract, Inc.'s Mot. Summ. J. Ex. B, ECF No. 301.2); and (iii) T.A. Kaiser, the subcontractor that furnished the materials, equipment, and labor necessary to install the Project's HVAC systems, (*see generally* Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Opp'n T.A. Kaiser Heating & Air, Inc.'s Mot. Summ. J. Ex. A, ECF No. 373).

7. To fulfill its duty to procure trusses for the Project, Madison executed a signed purchase order with Trussway (the "Purchase Order"). (Purchase Order 1.) The Purchase Order contained the specifications, quantity, and pricing for the floor and roof trusses Trussway would provide and set forth further terms applicable to

the sale of the trusses, including an express warranty. (Purchase Order 1–2.) Trussway contends that this warranty extends to Crescent, (Trussway's Br. Supp. 18), while Crescent contends that it does not, (Crescent's Opp'n Br. 10).

8. After the Project was completed, the floors in two of its apartments began sagging. Inspections revealed that the floor trusses underneath these apartments were defective. (Br. AP Atl., Inc. and Adolfson & Peterson, Inc. Supp. Mot. Summ. J. Ex. D, at 108:14–21, ECF No. 323.4.) Crescent hired an engineering firm, Simpson Gumpertz & Heger, Inc. ("SGH"), to conduct an investigation. After examining the apartments with noticeable defects and a wider sample of other apartments, SGH informed Crescent that it believed the floor truss defects were systemic and pervasive throughout the Project. (Crescent Univ. City Venture, LLC's Resp. Opp'n AP Atl., Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. Ex. E ¶ 14, ECF No. 414.6.)

9. Crescent and AP Atlantic had a series of discussions about possible work to remedy the Project's truss problems, but Crescent ultimately enlisted Summit Contracting Group, Inc., another contractor, to perform the Project-wide repair work Crescent requested. (Crescent Univ. City Venture, LLC's Resp. Opp'n AP Atlantic, Inc. and Adolfson & Peterson Constr., Inc.'s Mot. Summ. J. Ex. D ¶ 17, ECF No. 414.5.) The parties to these consolidated proceedings dispute whether Crescent's requested timeframe for remedial work was reasonable and whether the repair plan Crescent developed with SGH was appropriate.

B.    Procedural History

10.    AP Atlantic initiated litigation against Crescent on August 5, 2015 to recover allegedly outstanding payments due from Crescent.  (Compl. ¶ 23, ECF No. 1.)  Crescent asserted a counterclaim against AP Atlantic for breach of contract on multiple grounds, including the Project's floor truss defects.  (Def. Crescent Univ. City Venture, LLC's Answer & Countercl. Am. Compl. 38, 43–57, ECF No. 19.)  The Court refers to this original lawsuit, which bears the Mecklenburg County civil case number 15 CVS 14745, as the "Lead Action."

11.    On April 14, 2016, the Chief Justice of the Supreme Court of North Carolina designated the Lead Action as a complex business case in accordance with Rules 2.1 and 2.2 of the General Rules of Practice for the Superior and District Courts and assigned the case to the undersigned.

12.    On August 19, 2016, Crescent began a separate Mecklenburg County action (16 CVS 14844) (the "Crescent Action") against AP Atlantic's parent entity, Adolfson & Peterson Construction, Inc. ("A&P") (collectively, with AP Atlantic, the "AP Parties"), to enforce a performance guaranty A&P executed in connection with AP Atlantic's work on the Project.  The Crescent Action was designated as a mandatory complex business case under N.C.G.S. § 7A-45.4(b) and assigned to the undersigned.  On October 10, 2016, the Court consolidated the Crescent Action with the Lead Action.  (Order Mot. Consolidate ¶ 7, ECF No. 98.)

13.    By late 2017, following multiple rounds of pleadings, several settlement agreements, voluntary dismissals, and a lengthy discovery process, Crescent and the

AP Parties had resolved all of their claims against each other except for Crescent's claims against the AP Parties related to the Project's truss defects. The AP Parties, in turn, maintained derivative third-party claims against multiple first- and lower-tier subcontractors, including Trussway, Madison, Sears, and T.A. Kaiser, asserting that, to the extent the AP Parties were liable to Crescent, that liability was the result of the first- and lower-tier subcontractors' breaches of contract or negligence. In response to this procedural posture, Crescent moved the Court to realign the parties to the case with Crescent as the Plaintiff, AP Atlantic and A&P as Defendants, and the remaining subcontractors as third-party or fourth-party defendants. All parties appearing in the consolidated proceedings consented. As a result, on December 11, 2017, the Court granted Crescent's motion and realigned the parties in accordance with Crescent's request. (Order Consent Mot. Realign Parties 5, ECF No. 284.)

14. The parties in the Lead and Crescent Actions filed summary judgment motions on February 12, 2018, the court-ordered deadline for such motions. That same day, Crescent filed a Complaint commencing a new Mecklenburg County Action against Trussway (18 CVS 1642) (the "Trussway Action"), in which Crescent asserted a single claim for negligence. (Compl. 1 [hereinafter "Trussway Action Compl."], ECF No. 3 (18 CVS 1642).) Crescent alleged that the Project's truss defects were caused by Trussway's negligence in designing, fabricating, manufacturing, handling, and storing the Project's floor trusses. (Trussway Action Compl. ¶ 41.) Crescent further alleged that this negligence resulted in Crescent incurring approximately $5,200,000 in costs related to the Project-wide truss repairs and approximately $2,679,592.79 in

other expenses, including expenses associated with giving residents cash stipends and offering residents temporary accommodations, transportation, and storage. (Trussway Action Compl. ¶¶ 31–32.)  Crescent also filed a motion asking the Court to consolidate the Trussway Action with the Lead and Crescent Actions.  (Mot. Consolidate 2, ECF No. 9 (18 CVS 1642).)

16.    On March 3, 2018, the Trussway Action was designated as a mandatory complex business case under N.C.G.S. § 7A-45.4(a) and assigned to the undersigned. Soon thereafter, Trussway filed a motion to dismiss Crescent's negligence claim, arguing that the claim was barred by the prior pending action (or prior action pending) doctrine.

16.    The Court held a hearing on the summary judgment motions filed in the Lead and Crescent Actions, Trussway's motion to dismiss the Trussway Action, and Crescent's motion to consolidate the Lead, Crescent, and Trussway Actions on May 30, 2018, at which all parties appearing in these consolidated proceedings were represented by counsel.  At the hearing, counsel for Trussway informed the Court that consolidating the Trussway Action with the Lead and Crescent Actions would be the least prejudicial option available to the Court, from Trussway's perspective, in the event the Court denied Trussway's motion to dismiss the Trussway Action.

17.    In an Order and Opinion dated July 16, 2018, the Court denied Trussway's motion to dismiss the Trussway Action and granted Crescent's motion to consolidate. *Crescent Univ. City Venture, LLC v. Trussway Mfg., Inc.*, 2018 NCBC LEXIS 74, at *12–16 (N.C. Super. Ct. July 16, 2018).  The Court ordered that the Lead, Crescent,

and Trussway Actions were "consolidated for all future proceedings, including but not limited to trial," that prior pleadings were deemed "filed in both actions," and that all disputed issues raised in the Trussway Action would be deemed "to be disputed issues in the Lead Action." *Id.* at \*14–15.

18. In its subsequent Order and Opinion addressing supplemental discovery in the Trussway Action, the Court further ordered that "[d]iscovery in the Lead Action and Crescent Action [would] remain closed" and that further discovery allowed on Crescent's negligence claim in the Trussway Action would not be considered "part of the record in the Lead Action or the Crescent Action for purposes of the pending summary judgment motions in those actions." *Crescent Univ. City Venture, LLC v. AP Atl., Inc.*, 2018 NCBC LEXIS 92, at \*10 (N.C. Super. Ct. Aug. 29, 2018). The Court also ordered that if it were to "eventually dismiss the Trussway Action, the discovery ordered" in the Trussway Action would "be excluded from any trial of the remaining consolidated actions." *Id.*

19. Following consolidation, Trussway filed its Answer to Crescent's Complaint. In this Answer, Trussway "incorporate[d] by reference all of its defenses, cross-claims, and third-party claims previously pleaded in [the Lead Action] as if fully set forth" therein. (Trussway Mfg., Inc.'s Answer Crescent Univ. City Venture, LLC's Compl. 9, ECF No. 460.)

20. On May 22, 2019, after the conclusion of discovery in the Trussway Action, Trussway, Madison, Sears, and T.A. Kaiser filed the Motions for Summary Judgment. The Court held a hearing on the Motions for Summary Judgment on July 25, 2019,

at which all parties appearing in these consolidated proceedings were represented by counsel.

21.    The Motions for Summary Judgment are now ripe for resolution.

II.

LEGAL STANDARD

22.    Under Rule 56 of the North Carolina Rules of Civil Procedure, summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that any party is entitled to . . . judgment as a matter of law." *Craig v. New Hanover Cty. Bd. of Educ.*, 363 N.C. 334, 337, 678 S.E.2d 351, 353 (2009) (quoting N.C. R. Civ. P. 56(c)). A material fact is one that "would constitute or would irrevocably establish any material element of a claim or defense." *Abner Corp. v. City Roofing & Sheetmetal Co.*, 73 N.C. App. 470, 472, 326 S.E.2d 632, 633 (1985). "A 'genuine issue' is one that can be maintained by substantial evidence." *Dobson v. Harris*, 352 N.C. 77, 83, 530 S.E.2d 829, 835 (2000). Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference[.]" *DeWitt v. Eveready Battery Co.*, 355 N.C. 672, 681, 565 S.E.2d 140, 146 (2002) (citations and internal quotation marks omitted).

23.    On a motion for summary judgment, the moving party bears the burden of showing that no genuine issues of material fact remain to be resolved. *Camalier v. Jeffries*, 340 N.C. 699, 706, 460 S.E.2d 133, 136 (1995). "Evidence presented by the

parties is viewed in the light most favorable to the non-movant." *Summey v. Barker*, 357 N.C. 492, 496, 586 S.E.2d 247, 249 (2003). The trial court should grant summary judgment against an adverse party's claim only if the movant can prove "an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would be barred by an affirmative defense" or can show "through discovery that the opposing party cannot produce evidence to support an essential element of [its] claim." *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. If the moving party meets its burden, "the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that [it] can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). The responding party may not "rest upon the . . . allegations or denials" within its pleading, but must put forward specific facts showing there is a genuine issue for trial. N.C. R. Civ. P. 56(e).

III.

ANALYSIS

24. Trussway argues that the Court should enter summary judgment in its favor because the economic loss rule bars Crescent's negligence claim. Specifically, Trussway contends that Crescent has not presented evidence showing the breach of any duty other than the contractual duties imposed on Trussway by its Purchase Order with Madison. Because Crescent has not alleged or forecast evidence showing the breach of any separate or distinct extra-contractual duty imposed by law,

Trussway asserts that Crescent may not maintain a negligence claim against it. After careful consideration, the Court agrees.

25. "The economic loss rule addresses the intersection between contract remedies (including warranty remedies) and tort remedies." *Kelly v. Georgia-Pacific LLC*, 671 F. Supp. 2d 785, 791 (E.D.N.C. 2009). More a recognition of "the fundamental difference[s] between tort and contract claims," *Legacy Data Access, Inc. v. Cadrillon, LLC*, 889 F.3d 158, 164 (4th Cir. 2018) (quoting *Broussard v. Meineke Disc. Muffler Shops, Inc.*, 155 F.3d 331, 346 (4th Cir. 1998)), than a mechanical legal tool, the economic loss rule is a moniker for the widely accepted principle that "[c]ontract law, and the law of warranty . . . , is well suited to commercial controversies [where] the parties may set the terms of their own agreements[,]" *E. River S.S. Corp. v. Transamerica Delaval Inc.*, 476 U.S. 858, 872–73 (1986), in ways that the law of torts, particularly negligence, is not, *see Tiara Condo. Ass'n, Inc. v. Marsh & McLennan Cos.*, 110 So. 3d 399, 401 (Fla. 2013) ("[W]e recognize[ ] the economic loss rule as the fundamental boundary between contract law, which is designed to enforce the expectancy interests of the parties, and tort law, which imposes a duty of reasonable care and thereby encourages citizens to avoid causing physical harm to others." (internal quotation marks omitted)).

26. Originating in the products liability context, the economic loss rule, in its simplest form, holds that "purely economic losses are not ordinarily recoverable under tort law." *See, e.g., 2000 Watermark Ass'n v. Celotex Corp.*, 784 F.2d 1183, 1185 (4th Cir. 1986) (collecting cases and noting that "historically the only tort action available

to the disappointed purchaser suffering an intangible commercial loss was an action for fraud"). Under the economic loss rule, when a product does not meet its purchaser's needs or injures itself, and the product's owner thereby suffers only economic loss, no action in negligence will lie against the seller or the product's manufacturer. *See E. River S.S. Corp.*, 476 U.S. at 871 (holding manufacturers have "no duty under either a negligence or strict products-liability theory to prevent a product from injuring itself"); *Seely v. White Motor Co.*, 403 P.2d 145, 151 (Cal. 1965) ("[I]n actions for negligence, a manufacturer's liability is limited to damages for physical injuries and there is no recovery for economic loss alone.").

27. Put another way, before tort liability will be imposed, particularly liability for negligence, the majority of courts require a personal injury or an injury to personal property. *See 2000 Watermark Ass'n*, 784 F.2d at 1186. Personal property, however, does not simply mean any property beyond the immediate good or product sold. Rather, courts consistently hold "that when a component part of a product or a system injures the rest of the product or the system, only economic loss has occurred." *Wilson v. Dryvit Sys., Inc.*, 206 F. Supp. 2d 749, 753 (E.D.N.C. 2002), *aff'd*, 71 Fed. App'x 960 (2003); *see E. River S.S. Corp.*, 476 U.S. at 867–68.

28. North Carolina expressly adopted the economic loss rule in *Chicopee, Inc. v. Sims Metal Works, Inc.*, 98 N.C. App. 423, 391 S.E.2d 211 (1990), in which our Court of Appeals held the rule barred a plaintiff from recovering economic losses from a manufacturer of component parts. *Id.* at 432, 391 S.E.2d at 217 ("The majority of courts which have considered this question have held that purely economic losses are

not ordinarily recoverable under tort law. We adopt this rule[.]" (citing *2000 Watermark Ass'n*, 784 F.2d at 1185)). Prior to *Chicopee*, however, North Carolina courts endorsed the principles underlying the economic loss rule, recognizing that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." *N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co.*, 294 N.C. 73, 81, 240 S.E.2d 345, 350 (1978), *rejected in part on other grounds*, *Trs. of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc.*, 313 N.C. 230, 328 S.E.2d 274 (1985). These decisions recognized that a tort action will not lie against a promisor "for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Id.* at 83, 240 S.E.2d at 351; *see Spillman v. Am. Homes of Mocksville, Inc.*, 108 N.C. App. 63, 65, 422 S.E.2d 740, 741–42 (1992) ("[A] tort action does not lie against a party to a contract who simply fails to properly perform the terms of the contract, even if that failure to properly perform was due to the negligent or intentional conduct of that party, when the injury resulting from the breach is damage to the subject matter of the contract.").

29.  As this Court has previously noted, the variations of North Carolina's economic loss rule represented by *Ports Authority* and *Chicopee* have been applied by this State's courts in both the products liability context and in breach of contract cases more broadly. *Artistic S. Inc. v. Lund*, 2015 NCBC LEXIS 113, at *22–23 (N.C. Super. Ct. Dec. 9, 2015). Those cases citing *Ports Authority* to apply the rule more broadly have held that "[t]o state a viable claim in tort for conduct that is also alleged to be a breach of contract, 'a plaintiff must allege a duty owed . . . by the defendant separate

and distinct from any duty owed under a contract.'" *Akzo Nobel Coatings, Inc. v. Rogers*, 2011 NCBC LEXIS 42, at \*48 (N.C. Super. Ct. Nov. 3, 2011) (quoting *Kelly*, 671 F. Supp. 2d at 791); *see also Kaleel Builders, Inc. v. Ashby*, 161 N.C. App. 34, 41–42, 587 S.E.2d 470, 476 (2003) (holding general contractor's failure to properly perform under a construction contract did not give rise to an injury in tort). The differing ways in which courts have discussed the economic loss rule in these different contexts, however, has caused some confusion about when and how the economic loss rule may affect claims in litigation. The instant case requires the Court to address this confusion.

30. Trussway relies primarily on *Ports Authority* to argue that the economic loss rule precludes Crescent from recovering against Trussway in negligence. The Court thus begins its analysis with that decision.

31. In *Ports Authority*, a state agency contracted with a general contractor for the construction of two buildings. *Ports Auth.*, 294 N.C. at 81, 240 S.E.2d at 350. The general contractor engaged a subcontractor to perform roofing work. *Id.* After the buildings were completed, their roofs began to leak. *Id.* The agency, i.e., the owner, brought suit and asserted a claim for breach of contract against the general contractor and a claim for negligence against both the general contractor and the roofing subcontractor.[1] *Id.* (noting that the claim against the general contractor and subcontractor alleged that they had "negligently failed to allow the roofs . . . to dry properly before applying the roofing material or failed to allow the roofing material

---

[1] The owner also sued the manufacturer of the roofing materials and an insurance company under a guaranty bond related to the work. *Id.*

itself to dry properly before installing it" and that "the leaks in the roofs were caused by this negligent failure to exercise proper care and workmanship in the construction of the roofs").

32.     The Supreme Court of North Carolina first reviewed the owner's attempt to assert a negligence claim against the general contractor. The Court noted that while North Carolina case law had recognized four general exceptions[2] to the ordinary rule that "a breach of contract does not give rise to a tort action by the promisee against the promisor," no case had ever allowed a tort action "against a promisor for his simple failure to perform his contract, even though such failure was due to negligence or lack of skill." *Id.* at 81–83, 240 S.E.2d at 350–51. Reviewing the owner's complaint,

---

[2] The Supreme Court of North Carolina described these four exceptions as cases in which a promisor would be held "liable in a tort action for a personal injury or damage to property proximately caused by his negligent, or wilful, act or omission in the course of his performance of his contract," and categorized the exceptions specifically as follows:

(1) The injury, proximately caused by the promisor's negligent act or omission in the performance of his contract, was an injury to the person or property of someone other than the promisee.

(2) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was to property of the promisee other than the property which was the subject of the contract, or was a personal injury to the promisee.

(3) The injury, proximately caused by the promisor's negligent, or wilful, act or omission in the performance of his contract, was loss of or damage to the promisee's property, which was the subject of the contract, the promisor being charged by law, as a matter of public policy, with the duty to use care in the safeguarding of the property from harm, as in the case of a common carrier, an innkeeper or other bailee.

(4) The injury so caused was a wilful injury to or a conversion of the property of the promisee, which was the subject of the contract, by the promisor.

*Id.* at 82, 240 S.E.2d at 350–51 (citations omitted).

the Court observed that the owner alleged that the general contractor had agreed to "construct buildings, including roofs thereon, in accordance with agreed plans and specifications" and "did not so construct the roofs." *Id.* at 83, 240 S.E.2d at 351. If that was the case, the Court wrote, it would be "immaterial whether [the general contractor's] failure was due to its negligence, or occurred notwithstanding its exercise of great care and skill." *Id.* The Supreme Court explained its reasoning:

> In either event, the promisor would be liable in damages. Conversely, if the roofs, as constructed, conformed to the plans and specifications of the contract, the promisor, having fully performed his contract, would not be liable in damages to the plaintiff even though he failed to use the degree of care customarily used in such construction by building contractors. Thus, the allegation of negligence by [the general contractor] in the second claim for relief set forth in the complaint is surplusage and should be disregarded.

*Id.* The Court thus concluded that "the only basis for recovery against [the general contractor], alleged in the complaint," was a "breach of contract[,] and the Court of Appeals was in error in its view that the complaint" alleged "an action in tort[.]" *Id.*

33. After dealing with the appellants' remaining contentions, the Supreme Court turned to the owner's challenges to the trial court's decision to dismiss the roofing subcontractor from the action. *Id.* at 86, 240 S.E.2d at 353. In reviewing the trial court's decision, the Court again applied the principles underlying the economic loss rule:

> Although the complaint states that the plaintiff seeks recovery against [the subcontractor] "in tort for the negligent installation of the roofs on these two buildings," it alleges that the [subcontractor] was the roofing subcontractor of . . . the general contractor, and that [the subcontractor] failed properly to apply the roofing material, in consequence of which failure the roofs leaked. This is simply an allegation that [the subcontractor] did not properly perform its contract with [the general contractor.]

*Id.* at 87, 240 S.E.2d at 353. As a result, the Court concluded that the owner did not "allege a cause of action in tort[.]" *Id.* The Court then held that the owner could not sue the subcontractor for breach of contract either, concluding that the owner was only an incidental beneficiary of the contract between the general contractor and the roofing subcontractor. *Id.* Because there was no basis for pursuing the subcontractor in contract or tort, the Court affirmed the trial court's dismissal of the owner's action against the subcontractor.

34. *Ports Authority* would thus appear to favor Trussway and control the Court's decision in this case, where Crescent, the owner and developer of a commercial construction project, seeks to recover against Trussway, a subcontracting party, for negligence in the performance of duties Trussway undertook as part of an agreement to service the construction project.

35. Crescent vigorously disagrees, however, and argues that Trussway should be liable in negligence to Crescent because the loss Crescent suffered in the performance of Trussway's contract with Madison was an injury to the property of someone other than the promisee (i.e., Madison), the first of *Ports Authority*'s four identified instances in which a party's breach of contract may give rise to a tort claim. (Crescent's Opp'n Br. 9); *see Ports Auth.*, 294 N.C. at 82, 240 S.E.2d at 350. Crescent also argues that *Ports Authority*'s holding was not that the owner in that case was unable to assert a negligence claim against the roofing subcontractor, but simply that the owner did not correctly plead a negligence claim concerning the leaking roof. The Court disagrees with both assertions.

36. As an initial matter, if the first of *Ports Authority*'s exceptions was applicable in this case, it would have been applicable in *Ports Authority* itself, where the promisee under the roofing subcontractor's agreement was the general contractor, not the owner of the buildings. *See Ports Auth.*, 294 N.C. at 87, 240 S.E.2d at 353. In that case, however, our Supreme Court clearly held that the owner's claim against the roofing subcontractor, which alleged the subcontractor "negligently failed" to properly install the roofs, merely alleged a breach of the contract under which the subcontractor was performing its services. *Id.* at 81, 87, 240 S.E.2d at 350, 353. Because a negligence claim does not lie "against a promisor for his simple failure to perform his contract," the Court held that the owner could not assert a tort claim for the negligent installation of the roof. *Id.* at 83, 87, 240 S.E.2d at 351, 353. The ruling did not turn upon a technicality in the owner's pleading but rather upon the Court's holding that the subcontractor's failure to perform his contract, even if "due to negligence or lack of skill," did not give rise to a negligence claim. *Id.*

37. In the context of a commercial construction project, this holding makes sense. When an owner/developer contracts for the construction of a building, the subject matter of the bargain struck is the structure to be built. Where a subcontractor's negligence in performing under a subcontract causes a defect in a portion of that structure, any damage caused to the structure as a whole does not extend beyond the subject matter of the owner's bargain. The owner suffers nothing but economic loss. *Cf. Kelly*, 671 F. Supp. 2d at 793 (holding only economic loss occurred when a product used in constructing a home caused damage to that home);

*Wilson*, 206 F. Supp. 2d at 753–54 (holding damage caused to home by exterior cladding was only economic loss); *Land v. Tall House Bldg. Co.*, 165 N.C. App. 880, 885, 602 S.E.2d 1, 4 (2004) (holding damage caused to home by exterior cladding was only economic loss); *Warfield v. Hicks*, 91 N.C. App. 1, 9–10, 370 S.E.2d 689, 693–94 (1988) (holding claim for negligent construction could not be maintained where contractor supplied defective beams for use in construction of home).

38.    In such circumstances, where the owner/developer, general contractor, and subcontractors have negotiated for specific allocations of risk and have the opportunity to insure themselves against possible defects, allowing one party to circumvent the collective bargain by way of an action in negligence would put that party's interests above the interests of the others and undermine a crucial aspect of the construction industry. *See Blake Constr. Co. v. Alley*, 353 S.E.2d 724, 727 (Va. 1987) ("The parties involved in a construction project resort to contracts and contract law to protect their economic expectations.  Their respective rights and duties are defined by the various contracts they enter.  Protection against economic losses caused by another's failure properly to perform is but one provision the contractor may require in striking his bargain.").  As the Washington Supreme Court has noted, the consequences of such an approach are unappealing:

> We . . . maintain the fundamental boundaries of tort and contract law by limiting the recovery of economic loss due to construction delays to the remedies provided by contract.  We so hold to ensure that the allocation of risk and the determination of potential future liability is based on what the parties bargained for in the contract.  We hold parties to their contracts.  If tort and contract remedies were allowed to overlap, certainty and predictability in allocating risk would decrease and impede future business activity.  The construction industry in particular would suffer, for it is in this

industry that we see most clearly the importance of the precise allocation of risk as secured by contract. The fees charged by architects, engineers, contractors, developers, vendors, and so on are founded on their expected liability exposure as bargained and provided for in the contract. . . .

. . . If we held to the contrary, a party could bring a cause of action in tort to recover benefits they were unable to obtain in contractual negotiations.

*Berschauer/Phillips Constr. Co. v. Seattle Sch. Dist. No. 1*, 881 P.2d 986, 992–93 (Wash. 1994). Accordingly, the Court concludes that this case does not fall under the first of *Ports Authority*'s exceptions to the general rule that a breach of contract does not give rise to a tort action.

39. Viewing this case through the *Chicopee* product liability line of cases also supports the conclusion that Crescent may not recover from Trussway in negligence. "Under North Carolina law, when a defective component of a larger system causes damage to the rest of the system, only economic loss has occurred, and the economic loss rule still applies." *Kelly*, 671 F. Supp. 2d at 793. Here, where Trussway manufactured "an integral component," *Wilson*, 206 F. Supp. 2d at 754, of the Project, these cases would hold that Crescent has suffered only economic loss and is thus prohibited from bringing a suit in negligence. *See id.*; *Tall House Bldg. Co.*, 165 N.C. App. at 885, 602 S.E.2d at 4; *Chicopee, Inc.*, 98 N.C. App. at 431–32, 391 S.E.2d at 216–17 (holding where plaintiff contracted with intermediary to manufacture drying ranges, and intermediary contracted with manufacturer to manufacture portions of the drying ranges, plaintiff could not recover economic losses from manufacturer for negligence). In short, both series of North Carolina's cases discussing the economic loss rule cut against Crescent's argument.

40. The above points are perhaps best summarized by reference to *Anderson Elec., Inc. v. Ledbetter Erection Corp.*, 503 N.E.2d 246 (Ill. 1986), a case involving a defendant that provided both services (as in *Ports Authority*) and manufactured goods (as in *Chicopee*) as part of work done for a property owner and featuring an arrangement of contracts similar to the case *sub judice.* *Id.* at 247.

41. In *Anderson Electric,* the Illinois Supreme Court held that an owner that contracted for the installation of filtration units at its electric facility and suffered economic loss could not sue the manufacturer of the units for negligence. *Id.* at 249. The manufacturer both supplied the filtration units and contracted with the installer to inspect the units as they were installed. *Id.* at 247. The owner, however, contracted only with the installer, not the manufacturer. *Id.* The lack of privity between the owner and manufacturer was immaterial to the court, which held that "[a] plaintiff seeking to recover purely economic losses due to defeated expectations of a commercial bargain cannot recover in tort, regardless of the plaintiff's inability to recover under an action in contract." *Id.* at 249. Because the owner's economic losses "arose solely from disappointed commercial expectations[,] in that [the owner] lost the anticipated profits of its contract with" the installer, the court affirmed the lower court's dismissal of the owner's negligence claim. *Id.*[3]

42. The Court finds the reasoning in *Anderson Electric* persuasive and in accordance with *Ports Authority*, *Chicopee*, and the above-cited decisions from other

---

[3] The court also observed, in passing, that its decision did not leave the owner without an available remedy, because the owner had a breach of contract action pending in the trial court against the installer. *Id.*

jurisdictions. All of these cases compel the conclusion that Crescent has suffered nothing more than a disappointment, albeit an allegedly costly disappointment, in its commercial expectations arising from its contract with AP Atlantic. Put another way, Crescent has suffered only economic loss. Crescent may not recover for this economic loss by way of a negligence action against Trussway. The law instead recognizes Crescent's pending contract claim against AP Atlantic as the proper means by which Crescent must seek relief. *See Ports Auth.*, 294 N.C. at 83, 240 S.E.2d at 351; *Chicopee, Inc.*, 98 N.C. App. at 431–32, 391 S.E.2d at 216–17.

43. Crescent vehemently argues against this result and contends that case law subsequent to *Ports Authority* makes clear that "the economic loss rule does not operate to bar a negligence claim in the absence of a contract between the parties," quoting *Lord v. Customized Consulting Specialty, Inc.*, 182 N.C. App. 635, 637, 643 S.E.2d 28, 29 (2007). (Crescent's Opp'n Br. 6.) In particular, Crescent argues that the Supreme Court of North Carolina's decision in *Oates v. JAG, Inc.*, 314 N.C. 276, 333 S.E.2d 222 (1985), and the North Carolina Court of Appeals' decision in *Lord* both recognize a cause of action in negligence against construction contractors or subcontractors by owners in the absence of contractual privity. The Court disagrees that either case can be read so broadly.

44. Although it did not reference *Ports Authority* or the economic loss rule directly, in *Oates* the Supreme Court of North Carolina again considered the principles expressed in *Ports Authority*, this time allowing a negligence claim based upon economic loss to stand. *Id.* at 281, 333 S.E.2d at 226. In *Oates*, the plaintiff-

homeowners, who were not the original purchasers of their home, alleged that they discovered "numerous defects" in their home's construction after purchase that required correction, prompting them to bring a suit against the home's builder to recover their economic loss. *Id.* at 277–78, 333 S.E.2d at 224. After having their action dismissed, the homeowners appealed to the Court of Appeals, which affirmed the trial court's decision "on the sole ground that plaintiffs did not buy the home from [the builder] and that there had never been a contractual relationship between" the homeowners and the builder. *Id.* at 278, 333 S.E.2d at 224.

45. The Supreme Court of North Carolina reversed the Court of Appeals, concluding that the lower courts had placed too great an emphasis on an implied warranty theory and that the homeowner's action sounded in negligence. *See id.* at 279, 333 S.E.2d at 225. Addressing the effect of the lack of privity between the homeowners and the builder, the Court adopted the language of a Florida appellate court decision, *Navajo Circle, Inc. v. Development Concepts Corp.*, 373 So. 2d 689 (Fla. Dist. Ct. App. 1979):

> [T]he absence of contractual privity between plaintiff and defendant does not affect plaintiff's tort claim, provided plaintiff can establish the existence of a duty between the parties, and defendant's breach of such duty, with the proximate result that plaintiff suffered the damages of which it complains . . . .
>
> The duty owed by a defendant to a plaintiff may have sprung from a contractual promise made to another; however, the duty sued on in a negligence action is not the contractual promise but the duty to use reasonable care in affirmatively performing that promise. The duty exists independent of the contract. Existence of a contract may uncontrovertibly establish that the parties owed a duty to each other to use reasonable care in performance of the contract, but it is not an exclusive test of the existence of that duty. Whether a defendant's duty to use reasonable care extends to a

plaintiff not a party to the contract is determined by whether that plaintiff and defendant are in a relationship in which the defendant has a duty imposed by law to avoid harm to the plaintiff.

*Oates*, 314 N.C. at 279, 333 S.E.2d at 225 (quoting *Navajo Circle, Inc.*, 373 So. 2d at 691).

46. Thus, whether the *Oates* homeowners could maintain a negligence claim against the builder did not turn on their contractual privity, but on whether the homeowners and the builder were "in a relationship in which the [builder had] a duty imposed by law to avoid harm to the" homeowners. *See id.* Having reached this question, the Court was persuaded that the builder owed the homeowners a duty of reasonable care, citing the reasoning in another Florida appellate decision, *Simmons v. Owens*, 363 So. 2d 142 (Fla. Dist. Ct. App. 1978):

> We must be realistic. The ordinary purchaser of a home is not qualified to determine when or where a defect exists. Yet, the purchaser makes the biggest and most important investment in his or her life and, more times than not, on a limited budget. The purchaser can ill afford to suddenly find a latent defect in his or her home that completely destroys the family's budget and have no remedy for recourse. This happens too often. The careless work of contractors, who in the past have been insulated from liability, must cease or they must accept financial responsibility for their negligence. In our judgment, building contractors should be held to the general standard of reasonable care for the protection of anyone who may foreseeably be endangered by their negligence.

*Oates*, 314 N.C. at 280–81, 333 S.E.2d at 225–26 (quoting *Simmons*, 363 So. 2d at 143). On the basis of "the reasoning . . . in *Simmons*," the Supreme Court stated its holding: "a subsequent purchaser can recover in negligence against the builder of the property if the subsequent purchaser can prove that he has been damaged as a proximate result of the builder's negligence." *Id.* at 281, 333 S.E.2d at 226.

47. Contrary to Crescent's argument, the Supreme Court of North Carolina's decision in *Oates* did not turn on the availability of a contract or warranty remedy against the builder. *See id.* at 280, 333 S.E.2d at 225 (stating that the homeowners had an actionable negligence claim "regardless of the validity of any claim based on breach of an implied warranty"). As the Court explained, a plaintiff's ability to maintain a negligence claim depends upon whether the plaintiff "can establish the existence of a duty between the parties, and [the] defendant's breach of such duty, with the proximate result that [the] plaintiff suffered the damages of which it complains[.]" *Id.* at 279, 333 S.E.2d at 225 (quoting *Navajo Circle, Inc.*, 373 So. 2d at 691). The duty of care giving rise to a negligence claim "exists independent of" any contract, and whether such a duty is owed is "determined by whether that plaintiff and defendant are in a relationship in which the defendant has a duty imposed by law to avoid harm to the plaintiff." *Id.* In other words, duties imposed by contract and duties of care imposed by law are separate, and a claim for negligence may only be maintained where a duty of care has been breached. This is the same principle expressed in more recent case law considering the economic loss rule. *See Akzo Nobel Coatings, Inc.*, 2011 NCBC LEXIS 42, at *48 ("To state a viable claim in tort for conduct that is also alleged to be a breach of contract, 'a plaintiff must allege a duty owed . . . by the defendant separate and distinct from any duty owed under a contract.'" (quoting *Kelly*, 671 F. Supp. 2d at 791)).

48. Instead, *Oates* turned upon our Supreme Court's decision to impose a duty of care upon residential homebuilders for the benefit of subsequent home purchasers

who suffer economic loss. This duty of care did not exist simply because the homeowners lacked a contractual remedy, but rather was imposed due to policy concerns. As the Supreme Court of Virginia has noted while discussing the economic loss rule, when the law imposes a duty of care upon a party, it reflects a judgment that others have an interest which is entitled to protection and which the party should be required to protect:

> A duty to use ordinary care and skill is not imposed in the abstract. It results from a conclusion that an interest entitled to protection will be damaged if such care is not exercised. Traditionally, interests which have been deemed entitled to protection in negligence have been related to *safety* or freedom from physical harm. Thus, where personal injury is threatened, a duty in negligence has been readily found. Property interests also have generally been found to merit protection from physical harm.

*Blake Constr. Co.*, 353 S.E.2d at 726; *accord Barnes v. Caulbourne*, 240 N.C. 721, 725, 83 S.E.2d 898, 901 (1954) (stating that a party's legal duty in negligence "varies according to subject matter and relationships"). These same considerations are generally not present when a party suffers the "mere deterioration [of a product] or loss of [a] bargain," as courts believe such losses involve "a failure to meet some standard of *quality* [which] . . . must be defined by reference to that which the parties have agreed upon." *Blake Constr. Co.*, 353 S.E.2d at 726.[4]

---

[4] The Supreme Court of Virginia is hardly alone in making this point. *See, e.g.*, *2000 Watermark Ass'n*, 784 F.2d at 1186 ("The distinction that the law makes between recovery in tort for physical injuries and recovery in warranty for economic loss is hardly arbitrary. It rests upon an understanding of the nature of the responsibility a manufacturer must undertake when he distributes his products. He can reasonably be held liable for physical injuries caused by defects by requiring his products to match a standard of safety defined in terms of conditions that create unreasonable risks of harm or arise from a lack of due care. This is reasonable because the cost of injury may be an overwhelming misfortune to the person injured. It is a needless misfortune since the risk of that injury can be insured by the manufacturer and distributed among the public as a cost of doing business. This rationale,

49. Thus, in allowing the subsequent-purchaser homeowners in *Oates* to sue their home's builder, our Supreme Court recognized a limited exception to the economic loss rule after concluding that subsequent purchasers of residential homes should be entitled to protection under tort law for their economic losses. *See Oates*, 314 N.C. at 280–81, 333 S.E.2d at 225–26 (reasoning that "[t]he ordinary purchaser of a home is not qualified to determine when or where a defect exists" but is making "the biggest and most important investment in his or her life" and can "ill afford to suddenly find a latent defect in his or her home that completely destroys the family's budget and have no remedy for recourse").

50. The Court therefore concludes that *Oates* should not be read as necessarily tying the availability of a negligence claim to the availability of contractual remedies or a lack thereof, as Crescent suggests. To the contrary, *Oates* reaffirmed *Ports Authority*'s approach of treating matters of contract and matters of tort separately. The Court also disagrees with Crescent that *Oates* imposed a duty of care on subcontractors or contractors generally for the benefit of all owners or developers. Had it done so, *Oates* would have overruled *Ports Authority*. *See Ports Auth.*, 294 N.C. at 83, 87, 240 S.E.2d at 351, 353 (holding general contractor and subcontractor not liable in negligence for breaches of contract). Nothing in *Oates*, however, "suggests [such] an intent[.]" *Warfield*, 91 N.C. App. at 10, 370 S.E.2d at 694. Instead, the Court concludes *Oates* should be read as imposing a duty of care on

---

however, does not justify requiring the consuming public to pay more for their products so that the manufacturer can insure against the possibility that some of his products will not meet the business needs of his customers.").

*residential* builders in favor of subsequent homebuyers because of the particular vulnerabilities of, and the limited avenues of recovery otherwise available to, such individuals. *See Oates*, 314 N.C. at 280–81, 333 S.E.2d at 225–26; *Warfield*, 91 N.C. App. at 10, 370 S.E.2d at 694 (characterizing *Oates* as recognizing a means of redress for subsequent homebuyers).

51. Similarly, the Court concludes that the *Lord* decision does not apply to the facts of this case. In *Lord*, the plaintiffs were homeowners who bought their home directly from the builder. *Lord*, 182 N.C. App. at 637, 643 S.E.2d at 29. The builder obtained trusses for the construction from a manufacturer. *Id.* at 637–38, 643 S.E.2d at 29. After the homeowners discovered problems with these trusses, they sued the builder and manufacturer. *Id.* at 638, 643 S.E.2d at 30. A jury found against the homeowners on their claims against the builder, but awarded damages based upon the manufacturer's negligence in designing or manufacturing the trusses. *Id.* The manufacturer appealed, arguing that the economic loss rule barred the homeowners' claims. *Id.* at 639, 643 S.E.2d at 30.

52. The Court of Appeals disagreed with the manufacturer's arguments. The court began by noting that the economic loss rule "encourages contracting parties to allocate risks for economic loss themselves," and observing that there was no contract between the homeowners and the manufacturer. *Id.* at 639–40, 643 S.E.2d at 30–31. The court also noted that it believed the holding of *Oates* was relevant and applicable, repeating the passages that *Oates* adopted from *Navajo Circle* and *Simmons* concerning the necessity of a duty of care in negligence actions and the

unacceptability of leaving homeowners without a remedy against building contractors. *Id.* at 641, 643, 643 S.E.2d at 32–33. The court then held that the manufacturer had a duty to use reasonable care in performing its subcontract with the builder to provide reliable trusses for the homeowners' residence. *Id.* at 643, 643 S.E.2d at 33. As a concluding point, the court added the sentence Crescent now latches onto: "Because there was no contract between the [homeowners] and the [manufacturer], we further find that the economic loss rule does not apply and therefore does not operate to bar the [the homeowners'] negligence claims." *Id.*

53. *Lord* does not offer Crescent the support it desires. As an initial point, to the extent Crescent argues *Lord* imposes a duty of care, actionable in negligence, upon subcontractors to perform their contracts in the commercial construction context, that result would be inconsistent with the Supreme Court's decision in *Ports Authority*, and this Court would be bound to follow the decision of the higher court. *See Dep't of Transp. v. Charlotte Area Manufactured Hous., Inc.*, 160 N.C. App. 461, 472, 586 S.E.2d 780, 786 (2003). Furthermore, *Lord* did not express any intent to overrule *Chicopee* or the general rule adopted therein that economic loss is not recoverable in negligence. Instead, the Court concludes that *Lord* should be read as another policy-based decision imposing a duty of care upon building contractors for the benefit of residential homeowners suffering economic loss. This is apparent from the case law on which *Lord* relies.

54. *Lord* borrowed its statement linking the economic loss rule to the presence of a contract from *Ellis-Don Construction, Inc. v. HKS, Inc.*, 353 F. Supp. 2d 603

(M.D.N.C. 2004), *Lord*, 182 N.C. App. at 642, 643 S.E.2d at 32, a case in which the Middle District of North Carolina concluded that the economic loss rule would not bar a negligence claim by a general contractor against a developer-hired architect with which the general contractor did not have contractual privity, *Ellis-Don Constr., Inc.*, 353 F. Supp. 2d at 605–07. The Middle District reached that conclusion relying on established North Carolina precedent holding that "in the absence of privity of contract an architect may be held liable to a general contractor and his subcontractors for economic loss resulting from breach of a common law duty of care." *Id.* at 605 (quoting *Davidson & Jones, Inc. v. County of New Hanover*, 41 N.C. App. 661, 666, 255 S.E.2d 580, 583–84 (1979)). These decisions recognized a duty of care imposed upon architects for the benefit of construction contractors in the absence of contractual privity because of the "parties' working relationship," citing the " 'power of economic life or death' an architect holds over a contractor[.]" *Id.* (first quoting *Davidson & Jones, Inc.*, 41 N.C. App. at 667, 255 S.E.2d at 584; then quoting *Shoffner Indus., Inc. v. W.B. Lloyd Constr. Co.*, 42 N.C. App. 259, 266, 257 S.E.2d 50, 55 (1979)).

55. Thus, in referencing *Ellis-Don* and *Oates*, *Lord* drew upon examples of cases in which courts applying North Carolina law had imposed a duty of care to prevent economic loss, partially motivated by the lack of remedies otherwise available to the respective plaintiffs. *Compare Davidson & Jones, Inc.*, 41 N.C. App. at 667, 255 S.E.2d at 584 ("We hold that an architect in the absence of privity of contract may be sued by a general contractor or the subcontractors working on a construction project

for economic loss[.]"), *with Oates*, 314 N.C. at 280, 333 S.E.2d at 226 ("The purchaser can ill afford to suddenly find a latent defect in his or her home that completely destroys the family's budget and have no remedy for recourse."). *Lord* is another such case. The court made this point expressly, citing *Oates* and stating, "Here, too, we merely recognize a means of redress for those purchasers who suffer economic loss or damage from improper construction but who . . . have no basis for recovery in contract." *Lord*, 182 N.C. App. at 642, 643 S.E.2d at 32 (internal quotation marks omitted).

56. Reading *Oates* and *Lord* in light of *Ports Authority* and *Chicopee*, it is apparent that the absence of a contractual remedy in either case did not thereby automatically provide the homeowners with the ability to bring a claim in negligence. Rather, the homeowners' negligence claims in both *Oates* and *Lord* survived because the respective courts, motivated by the inadequacy of any contractual remedy available, concluded that the residential building contractor or manufacturer in question owed a duty of care to the homeowners to avoid causing them economic loss. *See Oates*, 314 N.C. at 280, 333 S.E.2d at 226 (reasoning that contractors "must accept financial responsibility for their negligence" because "too often" an "ordinary purchaser of a home" will have his or her budget destroyed by a latent defect and "have no remedy for recourse"); *Lord*, 182 N.C. App. at 642–43, 643 S.E.2d at 32–33 (repeating the language in *Oates* concerning residential homeowners and stating that such reasoning was compelling).

57.  *Oates* and *Lord* represent exceptions to the general rule implicit in the holdings of *Ports Authority* and *Chicopee*—that ordinarily, a party does not owe another a legal duty of care to avoid causing the other purely economic loss and, thus, a claim for negligence will ordinarily not arise from pure economic loss.  *See Ports Auth.*, 294 N.C. at 83, 240 S.E.2d at 351 (stating that there is no North Carolina case allowing a tort action against a party for "his simple failure to perform his contract, even though such failure was due to negligence or lack of skill"); *Chicopee, Inc.*, 98 N.C. App. at 432, 391 S.E.2d at 217 (adopting the rule that "purely economic losses are not ordinarily recoverable under tort law"); *see also E. River S.S. Corp.*, 476 U.S. at 871.

58.  Crescent argues that *Lord*'s holding cannot be limited to the context of residential homebuyers by citing *Hospira Inc. v. AlphaGary Corp.*, 194 N.C. App. 695, 671 S.E.2d 7 (2009), a case in which the North Carolina Court of Appeals concluded that the economic loss rule did not prevent a sophisticated business from suing a manufacturer in tort because the two were not in privity of contract.  *Id.* at 704–05, 671 S.E.2d at 14.  The Court disagrees.  Post-*Hospira*, the Court of Appeals appears to have disavowed this view of the economic loss rule, again adopting the position that "a viable tort action 'must be grounded on a violation of a *duty imposed by operation of law*, and the right invaded must be one that the law provides *without regard to the contractual relationship of the parties.*' "  *Rountree v. Chowan County*, 252 N.C. App. 155, 160, 796 S.E.2d 827, 831 (2017) (emphasis added) (quoting *Asheville Contracting Co. v. City of Wilson*, 62 N.C. App. 329, 342, 303 S.E.2d 365,

373 (1983)). This statement of the law is consistent with the Supreme Court of North Carolina's explanation of the distinctions between contractual duties and duties of care imposed by law in *Ports Authority* and *Oates*. The Court therefore concludes that it cannot follow *Hospira*'s contrary holding in this case.

59. For these reasons, the contractual relationship, contractual remedies, or lack of either between Crescent and Trussway are immaterial in determining whether the economic loss rule bars Crescent's negligence claim. Instead, the true question the Court must answer is whether Trussway owed Crescent a duty of care to avoid causing Crescent purely economic loss. The default answer under the economic loss rule, as shown in *Ports Authority* and *Chicopee*, is that Trussway did not. The Court concludes this default answer is the correct one in this case, which does not present a set of circumstances warranting a policy-based exception to the economic loss rule, as found in *Oates* or *Lord*.

60. Unlike a residential homebuyer, Crescent had extensive bargaining power and sway in determining how risk would be allocated between itself, AP Atlantic, and the various subcontractors AP Atlantic employed to work on the Project. This power resulted from Crescent's status as a sophisticated developer and the terms of the agreement between Crescent and AP Atlantic.

61. The agreement between Crescent and AP Atlantic was set forth in multiple standard forms, including the American Institute of Architects' ("AIA") Document A102 – 2007 Standard Form of Agreement Between Owner and Contractor (the "Standard Form Agreement"), which granted Crescent certain rights to oversee the

subcontracting process.  (Standard Form Agreement 1.)  Under Article 10 of the Standard Form Agreement, Crescent was given the power to "designate specific persons or business entities from whom" AP Atlantic would "obtain bids."  (Standard Form Agreement § 10.1.)  AP Atlantic was obligated to deliver the bids it received to Crescent, and Crescent was invested with the authority to "determine, with the advice of [AP Atlantic], which bids [would] be accepted."  (Standard Form Agreement § 10.1.)  AP Atlantic was also required to provide Crescent with a template of the form subcontract AP Atlantic proposed using on the Project, and Crescent's written approval was required before that subcontract could be used.  (Standard Form Agreement § 10.3.)  Once AP Atlantic obtained signed copies of all subcontracts or purchase orders it made or issued, it was required to provide copies of those documents to Crescent.  (Standard Form Agreement § 10.3.)

62.    Crescent and AP Atlantic's agreement was also governed by the AIA's Document A201 – 2007 General Conditions of the Contract for Construction (the "General Conditions").  (General Conditions 1.)  The General Conditions required AP Atlantic to ensure that each subcontractor was bound by the terms of the contract documents between Crescent and AP Atlantic and required each subcontract to "preserve and protect the rights of [Crescent] and [the architect] under the [c]ontract [d]ocuments with respect to the [w]ork to be performed by the [s]ubcontractor so that [the] subcontracting thereof [would] not prejudice such rights[.]"  (General Conditions § 5.3.)  AP Atlantic was also required to make sure each subcontractor entered "into similar agreements with [its respective] [s]ub-subcontractors."  (General Conditions

§ 5.3.) In the event Crescent terminated its agreement with AP Atlantic for cause, it had the option to accept the automatic assignment of the subcontracts to itself and assume AP Atlantic's rights and obligations thereunder. (General Conditions § 5.4.)

63. These undisputed facts of record show that Crescent possessed the power to fully negotiate the allocation of the risk it faced in its agreement with AP Atlantic and that Crescent was given full opportunity to protect itself from economic loss incurred as a result of its bargain, whether such loss was due to AP Atlantic's conduct or the subpar performance of a subcontractor. Crescent is presently pursuing its bargained-for remedies against AP Atlantic in an action in these consolidated proceedings. While these remedies may be subject to a waiver of Crescent's consequential damages for breach of contract that would not apply to a negligence claim against Trussway, (*see* General Conditions § 15.1.6.), and thus may not allow Crescent to recover the entirety of its claimed economic loss, the economic loss rule advises that Crescent should be left to the results of its bargain. *See E. River S.S. Corp.*, 476 U.S. at 875 ("We were informed that these charterers could not have asserted the warranty claims. Even so, the charterers should be left to the terms of their bargains, which explicitly allocated the cost of repairs." (citation omitted)); *2000 Watermark Ass'n*, 784 F.2d at 1186; *Anderson Elec., Inc.*, 503 N.E.2d at 249; *Ports Auth.*, 294 N.C. at 83, 240 S.E.2d at 351; *Chicopee, Inc.*, 98 N.C. App. at 431–32, 391 S.E.2d at 216–17; *Blake Constr. Co.*, 353 S.E.2d at 727; *Berschauer/Phillips Constr. Co.*, 881 P.2d at 992–93.

64. In making this point, the Court strives to be clear—Crescent's ability to bring a contractual claim against AP Atlantic does not trigger the application of the economic loss rule in this case. The economic loss rule applies "without regard to the contractual relationship of the parties." *Rountree*, 252 N.C. App. at 160, 796 S.E.2d at 831 (quoting *Asheville Contracting Co.*, 62 N.C. App. at 342, 303 S.E.2d at 373). Instead, the Court highlights Crescent's power in the bargaining process and its contractual remedy against AP Atlantic to distinguish this case from those exceptions to the economic loss rule recognized in *Oates* and *Lord*. The general rule applies here, and the general rule holds that "purely economic losses are not . . . recoverable under tort law." *Chicopee*, 98 N.C. App. at 432, 391 S.E.2d at 217.

65. Accordingly, the Court concludes that Crescent's allegations and forecast evidence, even viewed in the light most favorable to Crescent, do not show that Trussway breached a duty of care imposed by operation of law or that Crescent has suffered anything other than economic loss. Thus, the Court further concludes that no genuine issue of material fact remains as to Crescent's negligence claim against Trussway and that summary judgment in Trussway's favor is appropriate on that claim.

66. The Court reaches this conclusion fully aware that the reasoning herein may leave developers like Crescent—or more broadly, remote purchasers or owners— without a remedy in either contract or tort in certain circumstances. This is a risk those engaged in commerce take. From a policy perspective, the negative consequences of holding parties to their fairly negotiated bargains is minimal when

compared to the harm caused when the law of negligence is allowed to circumvent parties' agreements. As aptly observed by the Wisconsin Supreme Court:

> [A]llowing remote commercial purchasers to recover in tort for what is a commercial contract claim would perversely encourage those purchasers to bargain for no warranty or insurance in exchange for a reduced purchase price because they could rely on tort remedies as their "warranty." Withdrawing application of the economic loss doctrine in this situation would encourage a remote commercial purchaser, who had been willing to assume the full risk of economic loss, to purchase the goods "as is" in exchange for a lower price; to roll the dice and hope the product does not fail; and to reap initially the financial benefit of a low purchase price. If the product does fail down the road, the commercial purchaser could still reach all the way back through intervening transactions, contracts, and warranties to sue the original manufacturer in tort. This would grant a commercial purchaser more than the benefit of the bargain to which it and the seller or manufacturer agreed and on which the purchase price was negotiated and paid.

*Daanen & Janssen, Inc. v. Cedarapids, Inc.*, 573 N.W.2d 842, 848 (Wis. 1998) (citations omitted).

67. In light of the Court's dismissal of Crescent's negligence claim against Trussway, the Court concludes that it need not reach the issues raised by the remaining motions for summary judgment. Trussway's third-party claims and crossclaims asserted against other parties in the Trussway Action do not seek affirmative damages, but rather indemnity and contribution in the event Trussway is found liable on Crescent's negligence claim. Accordingly, because the Court now enters summary judgment in Trussway's favor on Crescent's negligence claim, Trussway's claims are moot and should be dismissed. *See Spearman v. Pender Cty. Bd. of Educ.*, 175 N.C. App. 410, 413, 623 S.E.2d 331, 333 (2006) (holding dismissal of underlying claims against defendant mooted claims for indemnity and contribution

against third-party defendants); *see also In re Peoples*, 296 N.C. 109, 147, 250 S.E.2d 890, 912 (1978) ("Whenever, during the course of litigation it develops that . . . the questions originally in controversy between the parties are no longer at issue, the case should be dismissed[.]").  The Court will therefore deny as moot Madison's, Sears', and T.A. Kaiser's Motions for Summary Judgment relating to these claims.

IV.

CONCLUSION

68.  **WHEREFORE**, the Court hereby **ORDERS** as follows:

a.  Trussway's Motion is **GRANTED**.  Crescent's negligence claim against Trussway is dismissed with prejudice.

b.  Trussway's claims asserted in the Trussway Action are dismissed as moot.

c.  Madison's Motion is **DENIED** as moot.

d.  Sears' Motion is **DENIED** as moot.

e.  T.A. Kaiser's Motion is **DENIED** as moot.

f.  Consistent with the Court's August 29, 2018 Order and Opinion—and in the exercise of the Court's discretion—evidence obtained through discovery in the Trussway Action shall be excluded from any trial of the remaining consolidated actions.

**SO ORDERED**, this the 14th day of August, 2019.

/s/ Louis A. Bledsoe, III
Louis A. Bledsoe, III
Chief Business Court Judge